The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Jeffrey LEFTWICH, Defendant–Appellee.

The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

David Alan WADE, Defendant–Appellee.

Nos. 93SA290, 93SA291.

Supreme Court of Colorado, En Banc.

March 7, 1994.

 

Alexander M. Hunter, Dist. Atty., Twentieth Judicial Dist., William F. Nagel, Appellate Chief Deputy Dist. Atty., Bryan Quiram, Chief Deputy Dist. Atty., Boulder, for plaintiff-appellant.

Howard Bittman, Boulder, for defendant-appellee Jeffrey Leftwich.

Philip L. Dubois, Boulder, for defendant-appellee David Alan Wade.

Justice ERICKSON delivered the Opinion of the Court.

The prosecution in this interlocutory appeal challenges suppression orders entered by the Boulder County District Court in the prosecutions of Jeffrey Leftwich (Leftwich) and David Alan Wade (Wade).[1] Leftwich and Wade are each charged with possession of marijuana concentrate with intent to sell[2] and cultivation of marijuana[3] and are being tried separately. The prosecution obtained evidence it intends to use at the trial of Leftwich and the trial of Wade as the result of a warrant to search their residence.[4] Leftwich moved to suppress the evidence asserting that the search warrant was not valid and Wade joined the motion. After a hearing, the trial court concluded the affidavit that resulted in the search warrant did not set forth sufficient facts to allow a magistrate or judge (magistrate) to find probable cause to search Leftwich's home. The trial

---

1. This interlocutory appeal is proper pursuant to § 16–12–102(2), 8A C.R.S. (1986), and C.A.R. 4.1.

2. § 18–18–406(8)(b), 8B C.R.S. (1993 Supp.).

3. § 18–18–406(8)(a), 8B C.R.S. (1993 Supp.).

4. Leftwich and Wade both live in the residence that was searched. The search warrant that resulted in the evidence that is the basis of this appeal was based only on information about Leftwich. For simplicity, this opinion refers to the residence as Leftwich's residence.

court also held that the good-faith exception to the exclusionary rule and section 16–3–308, 8A C.R.S. (1986), are not applicable and therefore suppressed the evidence obtained in the search of the residence. We affirm the trial court's rulings.

## I

In March of 1993, Detective Kurt Weiler (Detective Weiler), an officer of the Boulder Police Department, received an anonymous letter addressed to the "Boulder Colorado Police Department—Drug Squad," which stated:

This letter is to inform you that the person described below is an active drug dealer and warrants investigation. This is based on first-hand knowledge and eyewitness accounts by me and others. Below are some facts that may help you.

*Person*

Name: Jeff

Age: 35–40

Height: 5′9″

Weight: 170 lbs.

Race: white

Features: Bald on the top of his head.

Crooked front teeth.

Address: Lives in Boulder, Colorado and is a student at the University.

*Vehicle*

Two door van with a large window on the drivers [sic] side.

The passenger side has a sliding door. Color is steel blue.

License plate number is MXS 518 or MSX 518, Colorado.

Drugs are collected at a music store located in Kansas City just North of the intersection of 39th and Main on the East side of the street. The collection times may coincide with the vacation times of the university in Colorado. The drugs are then taken to Boulder for resale.

We hope that this information will help you and are sorry that we must remain anonymous as other innocent people may get involved.

Your friends in Kansas City, March, 1993.

■ Detective Weiler commenced an investigation based on the information contained in the letter. He was able to confirm the non-incriminatory factual details recited in the letter, but the investigation did not yield any information implicating Leftwich in illegal activity.[5] At the suppression hearing, Detective Weiler stated: "I think based on the anonymous letter that I had, I really

---

**5.** The affidavit sets forth the following facts: Colorado License plate No. MSX–518 was listed to Jeffrey S. Leftwich who resided at 1720 Marshall Road # 25, Boulder, Colorado; Leftwich's vehicle is a 1976 steel-blue Ford van, which has a large window directly behind the driver's door and a sliding door on the passenger side; Leftwich is 5′11″ tall, 175 pounds, 39 years old, with brown eyes and hair and is bald on the top of his head; there is a music store at 3841 S. Main in Kansas City; the music store is located in a "Known ... high drug area"; Leftwich is a student at the University of Colorado and went to Kansas City during spring break in his Ford van; and a vehicle registered to an individual who had a previous conviction for possession of cocaine was parked in the driveway in front of Leftwich's residence.

The evidence does not support the conclusion that a known drug offender visited Leftwich's residence. The police did observe that a car was parked in front of Leftwich's house and that the car was registered to an individual who had a felony conviction. However, the police only saw a parked vehicle. They did not see who was driving the vehicle and thus could not state if the

driver of the automobile was the registered owner. The police did not witness anyone go from the vehicle into Leftwich's residence or from the residence to the vehicle. The inference that a known drug offender visited Leftwich's residence is thus mere conjecture. It is equally possible that a person driving a known drug offender's automobile visited Leftwich's residence or that a person driving a known drug offender's automobile parked in Leftwich's driveway and visited a different residence. Absent more complete information, any conclusion based on the location of a parked car is of little or no relevance.

The negligible impact that this information has on the probable cause calculus is evinced by the holding in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). In *Sibron*, an officer witnessed the defendant have separate conversations with more than six known narcotics addicts over a period of eight hours. The Supreme Court stated: *"The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security."* *Id.* at 62.

didn't have [the] opportunity to corroborate criminal activity, a lot of other facts [were] corroborated, not the criminal acts." He also stated: "I'm always going to try to look at the evidence and corroborate criminal activity. That's my job. In this case it didn't happen." [6]

There was no corroboration that Leftwich was involved with drugs. Nothing in the record establishes Leftwich ever visited the music store described in the letter or collected drugs at the music store in Kansas City. Nothing supports the claim that the music store was a site of drug activity, or that any drugs were taken to Boulder, Colorado. In addition, the record is devoid of any facts linking illegal activity to Leftwich's residence. The investigation only established that Leftwich lives in Boulder, goes to the University of Colorado, and took a trip to Kansas City during spring break.[7]

Despite the lack of any corroboration of the vague allegations of criminal activity in the letter and the absence of information linking drugs to Leftwich's residence, Detective Weiler prepared an affidavit for a search warrant for Leftwich's home. The affidavit was reviewed by Weiler's supervisor, the Boulder Police Department legal advisor, and the Boulder County Chief Deputy District Attorney. The chief deputy district attorney advised Detective Weiler that the affidavit presented a close case and that a judge might not sign it. Weiler nonetheless filed the application and a district court judge issued a warrant. A search of Leftwich's home was conducted and marijuana plants and marijuana concentrate were found.[8]

## II

## A

■ The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit the issuance of a search warrant except upon probable cause supported by oath or affirmation particularly describing the place to be searched and objects to be seized. Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to believe that evidence of criminal activity is located *at the place to be searched. People v. Abeyta,* 795 P.2d 1324, 1327 (Colo.1990); *People v. Quintana,* 785 P.2d 934, 936 (Colo.1990).

■ To determine if probable cause exists, the totality of the facts and circumstances known to the officer at the time of the search must be considered. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (abandoning the two-pronged test that was set forth in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). We have adopted the totality-of-the-circumstances test formulated in *Gates* in construing the Search and Seizure Clause of the Colorado Constitution. *People v. Pannebaker,* 714 P.2d 904, 907 (Colo.1986).

■ The totality-of-the-circumstances test does not lower the standard for probable cause determinations; it simply gives reviewing courts more flexibility to determine the overall reliability of information from a confidential informant:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is fair probability that con-

---

**6.** Detective Weiler admitted that this was the first time he based a warrant on an anonymous tip and that he had no experience establishing the sufficiency of an affidavit that relied on the statements of an unnamed informant. He also admitted that before discussing the letter with anyone, he knew that the anonymous letter posed problems that would have to be resolved by corroborating the allegations in the letter.

**7.** The police corroborated that Leftwich went to Kansas City during spring break by calling and asking him. Leftwich freely admitted that he traveled to Kansas City.

**8.** The inventory form executed by the police as a result of the search of Leftwich's residence states that "suspected hash" was seized. The statutory definition of "marijuana concentrate" includes hashish. § 18–18–102(19), 8B C.R.S. (1993 Supp.).

traband or evidence of crime will be found in a particular place.

*Gates,* 462 U.S. at 238, 103 S.Ct. at 2332; *see also Abeyta,* 795 P.2d at 1327 ("Whether facts in an affidavit provided by a confidential informant establish probable cause for a search warrant depends not on a rigid set of legal rules but on a practical, nontechnical totality of the circumstances approach that considers an informant's veracity, reliability, and basis of knowledge.") (quotations omitted). *Gates* provides that veracity or reliability and basis of knowledge should not be accorded independent status: "Instead, they are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates,* 462 U.S. at 233, 103 S.Ct. at 2329.

■ A reviewing court does not review a magistrate's determination of probable cause de novo because the determination is entitled to great deference. *Spinelli,* 393 U.S. at 410, 89 S.Ct. at 584. The duty of a reviewing court is only to ensure that a magistrate had a substantial basis for concluding that probable cause existed. *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33 (quoting *Jones v. United States,* 362 U.S. 257, 270–71, 80 S.Ct. at 725, 735–36, 4 L.Ed.2d 697 (1960)); *see also Abeyta,* 795 P.2d at 1327.

### B

■ The anonymous letter that implicates Leftwich does not establish a substantial basis for concluding there was probable cause to search Leftwich's residence. Pursuant to *Gates,* we consider "the various indicia of reliability (and unreliability) attending an informant's tip" in assessing the basis for a probable cause determination. *Gates,* 462 U.S. at 234, 103 S.Ct. at 2330.

Because the letter came from an anonymous informant, it is difficult to assess the veracity of the information contained in the letter. Detective Weiler could not consider or rely on the past performance of the informer and nothing in the letter constitutes a declaration against the informer's penal interest. *See Gates,* 462 U.S. at 227, 103 S.Ct. at 2326; *see also People v. Paquin,* 811 P.2d 394, 398 (Colo.1991) (emphasizing that the confidential informant personally spoke to the affiant and the informant had previously provided information which resulted in a felony arrest); *Abeyta,* 795 P.2d at 1328–29 (sustaining the finding of probable cause based in part on the fact that the affiant had personally spoken to three anonymous informants); *People v. Diaz,* 793 P.2d 1181, 1184–85 (Colo. 1990) (finding lack of probable cause in part because there was no information provided from which the court could assess the informants' veracity).

■ The inability of Detective Weiler to establish the informant's reliability and veracity does not end the inquiry because a deficiency regarding reliability and veracity can be overcome by a *strong showing* as to the informant's basis of knowledge or some other indicia of reliability. *See Gates,* 462 U.S. at 233, 103 S.Ct. at 2329–30; *Diaz,* 793 P.2d at 1183 ("Weakness in one area may be compensated by strength in another or some other indicia of reliability.") (quotations omitted). The only statement in the letter regarding the basis of the informer's knowledge is the statement, "this is based on first-hand knowledge and eyewitness accounts by me and others." A bare assertion of knowledge is not sufficient to establish an informer's basis of knowledge; there must be sufficient facts to allow a magistrate to determine how the informant obtained the information on which the affiant relies. *See Aguilar,* 378 U.S. at 113–14, 84 S.Ct. at 1513–14 (1962) (holding that one of the defects in the affidavit was its failure to inform the magistrate "of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were"); *see also United States v. Long,* 439 F.2d 628, 630–31 (D.C.Cir.1971) (holding that an affidavit which stated that two informants had "personal knowledge" that the defendant was engaged in a numbers operation was only a conclusion which did not make it sufficiently clear that the informants had actually observed the defendant's gambling activities); *State v. Baca,* 97 N.M. 379–81, 640 P.2d 485,

487 (1982) (determining that an affidavit which stated that an informant had "first hand personal knowledge" was insufficient because a magistrate could not determine whether the informant had "actually seen the defendant carry a .32–caliber pistol" or was relying "on mere hearsay or rumor").

The letter in this case does not allow an inference that the informer had personal knowledge Leftwich was involved in illegal activity. The informer only identifies Leftwich by his first name. The name of the music store is not provided, and the type of illegal substance is not indicated. The informer is only able to state that "the collection times *may* coincide with the vacation times of the university in Colorado." This statement is merely a speculation about Leftwich's schedule. The allegations do not even indicate at what stage of the alleged drug transaction Leftwich is involved; the letter simply states that the drugs "are collected" and "are then taken" to Boulder. It is not clear whether Leftwich is involved in collecting the drugs at the music store or transporting the drugs to Colorado. One of the serious omissions in the letter is the absence of any reference to where in Boulder the drugs were taken. Nowhere in the letter does the informant indicate that Leftwich's residence is the site of alleged drug activity.

In *Gates,* the police also received an anonymous letter, which stated:

> This letter is to inform you that you have a couple in your town who strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Greenway, off Bloomington Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys down and drives it back. Sue flys back after she drops the car off in Florida. May 3 she is

driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs. Presently they have over $100,-000.00 worth of drugs in their basement.

> They brag about the fact they never have to work, and make their entire living on pushers.

> I guarantee if you watch them carefully you will make a big catch. They are friends with some big drugs dealers, who visit their house often.

> Lance & Susan Gates

> Greenway

> in Condominiums

*Gates,* 462 U.S. at 225, 103 S.Ct. at 2325.

This letter is more detailed than the letter implicating Leftwich. Significantly, the informer in *Gates* provided specific information regarding the Gateses' modus operandi and stated contraband was stored in the Gateses' home. Despite the informer's statements implicating the Gateses, the Supreme Court held that the letter did not establish the basis of the informer's knowledge and that the letter, standing alone, did not provide sufficient evidence to allow a magistrate to find probable cause.[9]

In this case, the anonymous letter does not allow an inference that the informant had access to reliable information of Leftwich's alleged illegal activities or that evidence of illegal activity would be found at Leftwich's residence.

### C

■ Even if an informer's allegations do not establish probable cause, it may still be possible to obtain a warrant by corroborating the details of a tip through independent po-

9. The Supreme Court stated:

> [S]tanding alone, the anonymous letter sent to the Bloomingdale Police Department would not provide the basis for a magistrate's determination that there was probable cause to believe contraband would be found in the Gateses' car and home. The letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gateses' criminal activities. Something more was required, then, before a magistrate could conclude that there was probable cause to believe that contraband would be found in the Gateses' home and car.

*Illinois v. Gates,* 462 U.S. 214, 227, 103 S.Ct. 2317, 2326 (citing *Aguilar v. Texas,* 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964)).

lice work. *Gates,* 462 U.S. at 241–42, 103 S.Ct. at 2333–34; *see also Diaz,* 793 P.2d at 1183 ("The totality-of-circumstances test places particular importance on the value of corroboration of details of an informant's tip by independent police work.").

■■■■ Facts that are easily obtained or predictions that are easily made add little to the decision of whether probable cause for a search exists. In *Gates,* the Court applied this principle:

> [T]he anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. The letterwriter's accurate information as to the travel plans of each of the Gateses was of a character likely obtained only from the Gateses themselves, or from someone familiar with their not entirely ordinary travel plans. If the informant had access to accurate information of this type a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gateses' alleged illegal activities.

*Gates,* 462 U.S. at 245, 103 S.Ct. at 2335–36. In *People v. Turcotte–Schaeffer,* 843 P.2d 658, 660–61 (Colo.1993), we recognized that corroboration of non-criminal activity may support a finding of probable cause.[10] The focus of a court in reviewing an affidavit that relies on corroboration of non-criminal activity is the degree of suspicion that attaches to particular types of corroborated non-criminal acts and whether the informant provides details which are not easily obtained. *Id.* The purpose of the inquiry is to determine if the informer's statements regarding non-incriminatory facts indicate familiarity with the implicated individual or the alleged criminal activity that would allow an inference that the informer's allegations of criminal activity are reliable. In this case, Detective Weiler admitted he was only able to corroborate non-criminal activity. The facts that were verified are neither suspicious nor difficult to obtain and could merely be based on rumors and hearsay. In addition to the affidavit's insufficiency regarding criminal activity, neither the letter nor the investigation provided a substantial basis to determine if probable cause existed *to search Leftwich's residence.* In *People v. Taube,* 864 P.2d 123, 129 (Colo. 1993), we stated that an affidavit did not establish probable cause to search the defendant's residence because, "the affidavit [did not] indicate that the defendant's residence contained any of the drugs or stolen property allegedly involved in the illegal scheme." We noted that "no direct link between the cocaine and the defendant's residence was ever shown." *Id.* at 129 n. 10. In this case, neither the letter nor the investigation established a nexus between the alleged illegal activity and Leftwich's home.

■■■ Distilled to its essence, the letter is from an unidentified informant of unknown reliability and contains a vague and brief reference to illegal activity surrounded by innocuous details. If vague, unverifiable allegations accompanied by verifiable, innocuous facts can result in a warrant, the constitutional requirement that a search warrant only issue upon probable cause becomes a nullity. In this case, application of the totality-of-the-circumstances test announced in *Gates* establishes that there was not a substantial basis for concluding Leftwich was engaged in any illegal activity, let alone that drugs would be found in his house.

### III

The prosecution contends that even if Detective Weiler's affidavit failed to provide a

---

**10.** It is significant that in *People v. Turcotte–Schaeffer,* 843 P.2d 658 (Colo.1993), the search warrant was based on information from a named informant who personally advised the affiant that on ten separate occasions he had personally purchased controlled substances from an individual at the individual's home. The informer described the location of the home and provided information that he had been inside the residence and knew drugs were stored there. Although the court recognized that an affidavit can be based in part on the verification of non-criminal activity, the finding of probable cause was also based on the fact that because the informant was named, his admission was against his penal interest and thus had additional indicia of reliability. *Id.* at 661. Thus, *Turcotte–Schaeffer* is similar to *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), where all that was corroborated was innocent activity but the informer was a named informer who had given reliable information to the police in the past.

substantial basis to determine if probable cause existed, the good-faith exception to the exclusionary rule and section 16–3–308, 8A C.R.S. (1986), require that the trial court admit the illegally obtained evidence. We disagree.

## A

■ The trial court found that Detective Weiler's reliance on the warrant was not objectively reasonable and that the exception announced in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), does not apply. We agree.

In *Leon,* 468 U.S. at 922, 104 S.Ct. at 3420, and *Massachusetts v. Sheppard,* 468 U.S. 981, 988, 104 S.Ct. 3424, 3427–28, 82 L.Ed.2d 737 (1984), the Supreme Court announced a good-faith exception to the exclusionary rule in cases where an officer proceeds pursuant to a warrant. The court grounded the exception on the principle of objective reasonableness:

> [T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

*Leon,* 468 U.S. at 922–23, 104 S.Ct. at 3420–21 (citations omitted). The Court articulated four situations where an officer's reliance on a warrant would not be objectively reasonable and therefore not in good faith: (1) where a facially sufficient affidavit is based upon knowingly or recklessly made falsehoods; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the warrant is so lacking in specificity that the officers could not determine the place to be searched or the things to be seized; and (4) where the affidavit is so lacking in indicia of probable cause that official belief in its existence is unreasonable, i.e., the affidavit is a "bare bones" affidavit. *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420–21; *see also State v. Doile,* 244 Kan. 493, 769 P.2d 666, 672 (1989) (recognizing *Leon* established four categories

of unreasonable conduct); *State v. Hlavacek,* 185 W.Va. 371, 407 S.E.2d 375, 383 n. 5 (1991) (same); *see generally* 1 Wayne R. LaFave, *Search and Seizure* § 1.3(f) (2d ed. 1987).

In *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court clarified the standard in *Leon. Malley* involved a civil rights action pursuant to 42 U.S.C. § 1983 (1988) in which the plaintiff sued a state trooper for violating the plaintiff's civil rights by improperly applying for an arrest warrant. The trooper asserted qualified immunity claiming that he was "shielded from damages liability because the act of applying for a warrant is *per se* objectively reasonable, provided that the officer believes that the facts alleged in his affidavit are true." *Malley,* 475 U.S. at 345, 106 S.Ct. at 1098. The trooper also asserted that he was "entitled to rely on the judgment of a judicial officer in finding that probable cause exists and hence issuing the warrant." *Id.*

■ The Court stated it was applying "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon*" and explained that pursuant to *Leon* the question to be addressed:

> [I]s whether a reasonably well-trained officer in [the officer's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest. It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressure, will fail to perform as a magistrate should. *We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.*

*Id.* (emphasis added).[11]

Detective Weiler's reliance on the warrant to search Leftwich's residence was unreason-

11. *Malley* also establishes that the fact that a magistrate acted favorably on a warrant request

able under the fourth category described in *Leon*, i.e., that the affidavit was so lacking in probable cause that Detective Weiler knew, or should have known, that the search was illegal. *Leon*, 468 U.S. at 919, 104 S.Ct. at 3418–19 ("If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." (quoting *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975))); *see also United States v. McKneely*, 6 F.3d 1447, 1455 (10th Cir.1993) ("An officer who knows or should have known that a search warrant

was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence.").

In applying the good-faith exception to the facts in *Leon*, the Court stated that the officer's "application for a warrant clearly was supported by much more than a 'bare bones' affidavit." *Leon*, 468 U.S. at 926, 104 S.Ct. at 3422. Unlike the affidavit at issue in *Leon*, the affidavit in this case is a "bare bones" affidavit because it contains no facts that would allow a reasonable officer to conclude that probable cause existed to search Leftwich's residence. The statements in the affidavit regarding criminal activity are unsupported conclusions that are not based on reliable information.[12] *See United*

is of no moment in the determination of whether the officer acted with objective reasonableness because the question of reasonableness is to be judged as of the time of warrant application and thus without consideration of the fact that the magistrate thereafter issued a warrant. *See Malley v. Briggs*, 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1985) (holding that if an officer's request for a warrant is outside the range of professional competence expected of an officer, then that officer can not rely on the fact the magistrate issued the requested warrant); *see also United States v. Baker*, 894 F.2d 1144, 1148–49 (10th Cir.1990) ("where ... a reasonably well-trained law enforcement officer should himself have been aware that a proposed search would be illegal, a judicial officer's concurrence in the improper activity does not serve to bring it within the rule of *Leon* or *Sheppard*"); *People v. Camarella*, 54 Cal.3d 592, 286 Cal.Rptr. 780, 818 P.2d 63, 70–71 (Cal.1991) ("By definition, in *every* case in which the prosecution seeks the benefit of *Leon*, a magistrate has issued a warrant; issuance of the warrant defines the class of cases eligible for nonexclusion under the *Leon* rule. Because issuance of a warrant is a constant factor in these cases, it cannot logically serve to distinguish among them.").

The Supreme Court's refusal to allow a police officer to insulate his decision by relying on a magistrate's finding of probable cause indicates that a police officer can not rely on the decisions of other law enforcement personnel to insulate his decision. In *Baker*, the Tenth Circuit explained that a judicial officer's concurrence in illegal activity does not insulate the police officer's decision. If the decision of a neutral and detached magistrate is not relevant, the "hurried actions," *Aguilar*, 378 U.S. at 110–11, 84 S.Ct. at 1511–12, of those "engaged in the often competitive enterprise of ferreting out crime," *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1946), are also not relevant. When an affidavit fails to satisfy the require-

ments of probable cause and is clearly deficient on this face, the advice and recommendations of fellow officers and attorneys cannot buttress the sufficiency of the affidavit.

**12.** The interrelationship of the requirement that an affidavit for a warrant not be "bare bones" under *Leon* and the standard for reviewing a determination of probable cause under *Gates* was explained by Justice Brennen:

> Because the two standards overlap so completely, it is unlikely that a warrant could be found invalid under *Gates* and yet the police reliance upon it could be seen as objectively reasonable; otherwise, we would have to entertain the mind-boggling concept of objectively reasonable reliance upon an objectively unreasonable warrant.

*Leon*, 468 U.S. at 958–59, 104 S.Ct. at 3448–49 (Brennen, J., dissenting); *see also* Yale Kamisar, *Gates, "Probable Cause," "Good Faith," and Beyond*, 69 Iowa L.Rev. 551, 588–589 (1984) ("To impose a 'reasonable belief' exception on top of this already diluted standard surely would amount to a double dilution."); Wayne R. La-Fave, *Fourth Amendment Vagaries*, 74 J.Crim.L. & Criminology 1171, 1199 (1983) ("If, as the *Gates* majority beguiles, probable cause is nothing more than a matter of 'practical, commonsense' decisionmaking, then it would seem that a probable cause determination which is erroneous and thus lacking this sagaciousness is undeserving of either the appellation 'good faith' or the sympathetic reception which a 'good faith' qualification would allow."); *see generally* 1 Wayne R. LaFave, *Search and Seizure* § 1.3(f) (2d ed. 1987).

We recognize that these tests address differing concepts, i.e., *Gates* focuses on the degree of deference that a reviewing court should pay a magistrate's determination of probable cause while *Leon* focuses on police officer's decision to seek and then execute a certain warrant. None-

*States v. Baxter*, 889 F.2d 731, 734 (6th Cir. 1989) (stating that the affidavit was a 'bare bones' affidavit because "the officer involved . . . had to realize that the source of the information against the defendant was an unknown party who was unavailable and could not be demonstrated to be reliable"); *United States v. Jackson*, 818 F.2d 345, 350 n. 8 (5th Cir.1987) ("Because of our conclusion that the affidavit is totally lacking in indicia of reliability and basis of knowledge, and is therefore a bare-bones affidavit, the good-faith exception to the exclusionary rule is not available."); *United States v. Barrington*, 806 F.2d 529, 532 (5th Cir.1986) (determining that affidavit was a 'bare bones' affidavit under *Leon* ); *State v. Johnson*, 302 S.C. 243, 395 S.E.2d 167, 170 (1990) (holding that an affidavit which stated that the informant had seen drugs in the defendant's home in the last seventy-two hours was a 'bare bones' affidavit and therefore the good-faith exception could not be employed to validate the warrant); *Hlavacek*, 407 S.E.2d at 382–83 n. 5 (holding that an anonymous informant's tip regarding the defendant's trip to get marijuana and slight corroboration were insufficient to warrant application of the good-faith exception); *State v. Worley*, 179 W.Va. 403, 369 S.E.2d 706, 712 (holding that an affidavit which set out hearsay statements of an unknown declarant was of the bare-bones type), *cert. denied*, 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988); *State v. Adkins*, 176 W.Va. 613, 346 S.E.2d 762, 775 (1986) (stating that because an affidavit merely asserted a confidential informant observed marijuana inside the premises, the affidavit was conclusory and *Leon* was not applicable).

At the suppression hearing, Detective Weiler admitted that he knew the letter implicating Leftwich did not contain probable cause to search Leftwich's residence so he began an investigation to establish whether the informant was reliable. Detective Weiler also admitted his investigation did not corroborate that Leftwich was engaged in illegal activity. Officer Weiler knew, or should have

known, that the affidavit he submitted did not establish that probable cause existed to search Leftwich's residence. Therefore, the illegally obtained evidence is not admissible under the good-faith exception to the exclusionary rule.

## B

■ The prosecution also asserts that despite the absence of probable cause to search Leftwich's residence, section 16–3–308, 8A C.R.S. (1986), requires the evidence seized in the unconstitutional search be admitted. We disagree.

Section 16–3–308 provides in pertinent part:

> (2) As used in subsection (1) of this section:
>
> (a) "Good faith mistake" means a *reasonable* judgmental error concerning the existence of facts or law which if true would be sufficient to constitute probable cause
>
> . . . .
>
> (4)(a) It is hereby declared to be the public policy of the state of Colorado that, when evidence is sought to be excluded from the trier of fact in a criminal proceeding because of the conduct of a peace officer leading to its discovery, it will be open to the proponent of the evidence to urge that the conduct in question was taken in a *reasonable,* good faith belief that it was proper. . . .

(Emphasis added.)

■ The General Assembly enacted section 16–3–308 prior to the Supreme Court's decision in *Leon.* The purpose of the statute was to enact a good-faith exception to the exclusionary rule. The General Assembly based the law on *United States v. Williams,* 622 F.2d 830, 840 (5th Cir.1980), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), in which the Fifth Circuit enunciated a two-pronged test to determine when evi-

---

theless, both tests utilize a reasonableness standard to review the facts in an affidavit. Thus, in the vast majority of cases, if a court applies *Gates* and ascertains that a substantial basis for deter-

mining probable cause did not exist, the court will reach the conclusion that the officer unreasonably relied on the affidavit.

dence should be admitted despite a constitutional violation.

*Williams* states:

We emphasize that the belief, in addition to being held in subjective good faith, must be grounded in an objective reasonableness. It must therefore be based upon articulable premises sufficient to cause a reasonable, and reasonably trained, officer to believe that he was acting lawfully.

*Williams,* 622 F.2d at 841 n. 4a. The language and legislative history of section 16–3–308 clearly indicates that the General Assembly intended to apply an objective standard substantially similar to the reasonableness requirement later announced in *Leon.*[13] Because Detective Weiler's reliance on the affidavit was not reasonable, as discussed *supra* at section III(A), section 16–3–308 does not apply and the evidence should be excluded.

## IV

 The affidavit submitted by Detective Weiler did not provide a substantial basis for concluding that probable cause existed to search Leftwich's residence. From the time Detective Weiler received the letter until he prepared the affidavit, Detective Weiler, the members of the Boulder Police Department, and the chief deputy district attorney doubted whether probable cause existed to obtain a warrant. When a warrant is obtained, the legal sufficiency of the warrant depends upon whether facts were set forth which as a matter of law would allow a magistrate to determine if probable cause exists. The affidavit that Detective Weiler submitted was insufficient because it was devoid of facts that would establish that evidence of illegal activity would be found at Leftwich's residence. Because Detective Weiler knew, or should have known, the affidavit was insufficient, neither the good-faith exception announced in *Leon,* nor section 16–3–308, 8A C.R.S. (1986), permits the illegally obtained evidence to be admitted at Leftwich's or Wade's trials.

Accordingly, we affirm the suppression orders and remand the cases for further proceedings consistent with this opinion.

VOLLACK, J., dissents, and ROVIRA, C.J., joins in the dissent.

Justice VOLLACK dissenting:

The majority holds that, because the warrant issued by the judge in this case was not supported by probable cause, the drugs found during the search of Leftwich's residence must be suppressed. The majority further holds that the good faith exception to the exclusionary rule does not apply because no reasonable police officer would have relied on the warrant issued by the judge. I disagree with the majority's analysis and conclusions.

### I.

On March 12, 1993, the Boulder Police Department received an anonymous letter alleging that "Jeff," a student at the University of Colorado, was an "active drug dealer." The postmark on the letter was from Kansas City. The letter described the physical characteristics and age of the person, and provided a description of the vehicle he drove, including the vehicle license number. The letter also stated that the person was involved in transporting drugs from a music store in Kansas City to Boulder for resale. The full contents of the letter are related in the majority opinion.

The police officer assigned to the case, in conducting a search of the Boulder County vehicle registration computer, found that the

---

13. In discussing House Bill 1493, which created section 16–3–308, the drafter and co-sponsor of the bill, Representative Chris Paulson, was questioned regarding the meaning of "reasonable" in subsection 2(a) and 4(a). He stated that the bill is designed to implement the *Williams* decision in Colorado. A representative asked how the law would address the situation where a police officer is misinformed by a district attorney regarding the state of the law and acts on the misinformation. Representative Paulson responded that the arrest, or search, that resulted from this misinformation would be unreasonable under section 16–3–308 and the evidence obtained would be excluded. Representative Paulson stated that it is "unreasonable for us, in this day and age, to have police officers who are uninformed about the requirements for searches and seizures." *Hearings on H.B. 1493 Before the House Judiciary Committee,* 53d Gen. Assembly, 1st Reg.Sess. (audio tape, March 17, 1981, at 5:25–6:21).

vehicle described in the anonymous letter was registered to Jeffrey Leftwich. The letter's description of the vehicle, a blue 1976 Ford van, matched the information in the computer. The officer also obtained Leftwich's address. Next, the officer checked voter registration records and ascertained that Leftwich was thirty-seven years old, approximately the age reported by the informant. The officer's scan of the driver's license registry confirmed the address of Leftwich and the height and weight reported by the informant. A driver's license photograph matched the description provided in the anonymous letter.

The Boulder police officer later contacted the drug enforcement unit of the Kansas City Police Department. An analyst there confirmed that the music store described in the anonymous letter was in an area "known as a high drug area."

The anonymous letter predicted that Leftwich's trips to Kansas City might coincide with the vacation times of the University of Colorado. Spring Break at the University in 1993 occurred during the week of March 22–26. The police officer made two or three trips each day to Leftwich's address during that week, and noted that there were never any vehicles parked in front of the residence, which was a mobile-home trailer. On March 27, the officer observed a car parked in the driveway of the residence. After checking the number of the license plate of the vehicle against motor vehicle records and obtaining the name of the vehicle's owner, the officer was able to conclude that the trailer was visited by a felon who had been convicted two years earlier of possessing cocaine.[1]

During surveillance on March 28, the police officer recognized Leftwich's Ford van parked in the driveway of the residence. It matched the description of the van, including the license number, that was given in the anonymous letter.

On March 29, the police officer called Leftwich, asking to speak with "Mister Leftwich." The person who answered the telephone stated "This is Jeff." The officer identified himself and said he was investigating a traffic accident in Utah. Leftwich told the officer he had been in Kansas City during Spring Break. Leftwich also stated he was driving the blue Ford van on the trip. Later that morning, another officer observed a person enter the van and drive away. He stated it was the same person pictured in the driver's license photo of Leftwich.

Based on this information, the police officer applied for, and a Boulder District Court judge issued, a warrant to search Leftwich's trailer and van. The search found drug paraphernalia, including a triple-beam balance, seventeen marijuana plants, four ounces of marijuana, and one kilogram (2.2 pounds) of hashish.

## II.

I believe that probable cause existed to support the district court judge's decision to issue the warrant.

### A.

To decide whether there was probable cause, the majority claims that it applies the test of the "totality of the circumstances" enunciated in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and adopted by this court in *People v. Pannebaker*, 714 P.2d 904 (Colo.1986). Although the majority cites to *Gates*, it appears to apply instead the ritualistic *Aguilar–Spinelli* test, which *Gates* rejected in favor of the totality of the circumstances test.

In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the United States Supreme Court ruled that police could obtain probable cause from informants, that is, based on hearsay, but that the affidavit police submitted to the judge to obtain a warrant had to meet a two-pronged test. First, to address the potential problem of mistake, the police had to show a basis for the informant's knowledge. Second, the police had to show that the informant was

---

1. The majority bases the thrust of its opinion on its assertion that there was *no* corroboration by police of criminal activity, only of "innocent" acts. The majority apparently does not believe that the presence of a known drug offender's car at the residence of the defendant is entitled to be considered in the *Gates* "totality of the circumstances" calculus. I disagree.

credible, for example, through a reputation for honesty or veracity, or that the statement was against penal interest. In *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Supreme Court modified the *Aguilar* test. The court ruled that, if there was a weakness in the first or second prong, the police could make up for it through independent police investigation or corroboration of the informant's details.

Yet, an anonymous letter whose facts and allegations were corroborated by police would still likely fail the *Aguilar–Spinelli* test. In an attempt to rectify this dilemma, the Supreme Court in *Illinois v. Gates* abandoned the formalistic two-pronged test in favor of a test that determined probable cause by a "totality of the circumstances." The court enunciated the test as one that, through the eyes of a reasonable police officer, asked the common-sense practical question of whether there was probable cause. The two prongs were still relevant, but were no longer absolutes.

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329. Under a totality of the circumstances test, probable cause is found through a combination of all the facts and conditions, not a ritualistic application of legal tests. "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at 241, 103 S.Ct. at 2333–34 (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949)). Reasonable minds may differ on the question of whether a particular affidavit establishes probable cause. *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1983).

The majority announces that it is applying the *Gates* totality of the circumstances test to decide whether probable cause existed to search Leftwich's trailer. However, the opinion actually applies the prongs of the *Aguilar–Spinelli* test and bases its conclusion on the results of that test, not the *Gates* test.

First, the majority states that it is difficult to establish the anonymous informant's reliability and veracity. Maj. op. at 1266. It then attacks the basis of the informant's knowledge and concludes that the letter "does not allow an inference that the informer had personal knowledge Leftwich was involved in illegal activity." Maj. op. at 1267. Next, the majority asserts that, since there is a weakness in these *Aguilar* prongs, "it may still be possible to obtain a warrant by corroborating the details of a tip through independent police work." Maj. op. at 1267–1268.[2] The opinion then focuses on the lack of corroboration of Leftwich's criminal activity by the police. Finally, the majority reiterates its conclusions of the individual elements discussed above and holds that probable cause had not been established.

"[T]hese elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case." *Gates,* 462 U.S. at 230, 103 S.Ct. at 2328. Nowhere in its conclusion does the majority appear to apply the *Gates/Pannebaker* totality of the circumstances test. Instead, the opinion moves through the prongs of *Aguilar–Spinelli* and holds, based on an analysis of the individual factors of that test, that probable cause was not established.

### B.

I believe that, based on the totality of the circumstances, there was probable cause to believe that Leftwich was engaged in criminal activity and that the search warrant for his trailer was valid.

### 1.

I agree with the majority that the letter, alone, does not establish probable cause. However, the majority gives undue focus to

---

**2.** Although these factors are part of the *Gates* test as well as the *Aguilar–Spinelli* test, and although the majority opinion makes reference to *Gates* throughout its analysis, I do not believe that the United States Supreme Court in *Gates,* nor this court in *Pannebaker,* intended the kind of ritualistic application of these factors that is found in the majority opinion.

the inadequacies of the letter in order to buttress its position that there was no probable cause to search Leftwich's residence. Its critical dissection of each component of the letter is inappropriate in a *Gates/Pannebaker* totality of the circumstances analysis. Indeed, as the *Gates* majority noted, "the line-by-line scrutiny that the dissent applies to the anonymous letter is akin to that we find inappropriate in reviewing magistrate's decision." *Gates*, 462 U.S. at 245 n. 14, 103 S.Ct. at 2335 n. 14.

Although, standing alone, the letter is not sufficient to establish probable cause, the majority's criticism seeks to diminish further the credibility and reliability of the informant that the letter—and police corroboration—did establish. The letter provided an accurate description of Leftwich's physical characteristics and age that was verified through driver's license records and photographs. The letter described Leftwich's van and license plate number that allowed police to trace him to the trailer in which he lived. Most important, the letter predicted Leftwich's trip to Kansas City to collect the drugs and return to Boulder.

The detail of the letter shows a basis for confirming the informant's knowledge of the defendant and his activity. *See People v. Turcotte–Schaeffer*, 843 P.2d 658, 662 (Colo. 1993). In my opinion, however, it is the ability of the informant to predict future actions that should be afforded great weight in the probable cause determination. Here, the informant correctly predicted that Leftwich would travel to Kansas City on particular dates. The ability of an informant to predict future action is also an important component of probable cause determinations in *Gates* and other opinions. *See, e.g., Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The majority states that "[f]acts that are easily obtained or predictions that are easily made add little to

the decision of whether probable cause for a search exists." Maj. op. at 1268. I do not believe that the facts asserted by the informant's letter were easily obtained or the predictions easily made. Moreover, " 'because an informant is right about some things, he is more probably right about other facts.' " *Gates*, 462 U.S. at 244, 103 S.Ct. at 2335 (quoting *Spinelli*, 393 U.S. at 427, 89 S.Ct. at 493–94 (White, J., concurring)).

2.

The majority bases its decision on its claim that there was no police corroboration of criminal activity by Leftwich. As noted above, the majority does not give any weight to the fact that, while Leftwich's trailer was under surveillance, police concluded that Leftwich was visited by a convicted drug offender. In my opinion, this activity falls under the category of criminal corroboration.[3] We held in *People v. Turcotte–Schaeffer*, 843 P.2d 658 (Colo.1993), a case decided only thirteen months ago on a unanimous vote, that police need not corroborate an informant's information about criminal activity in order to establish probable cause, and that probable cause could be established solely through corroboration of non-criminal activity. *See also People v. Paquin*, 811 P.2d 394 (Colo.1991). Although the majority opinion correctly cites our ruling in *Turcotte–Schaeffer*, the majority does not apply to this case the principle that an informant's allegations of criminal activity need not be corroborated. Instead, the majority opinion repeatedly faults the police for their failure to corroborate the allegations of criminal activity. Its decision that there was no probable cause in this case is grounded almost entirely on the deficiency of police corroboration of illegal activity. By doing so, the majority implicitly weakens our decision in *Turcotte–Schaeffer*.[4]

---

**3.** The majority cites *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), for the proposition that police may not establish probable cause based solely on the fact that the defendant has had conversations with known narcotics addicts. I agree. I do not believe that the police in this case would be able to claim there was probable cause simply on the fact that Leftwich's trailer was visited by a known drug offender. I

conclude only that this fact is one element of the totality of the circumstances test and is thus worthy of consideration.

**4.** I disagree with the majority's reliance on *People v. Taube*, 864 P.2d 123 (Colo.1993), for the implication that the police's failure to corroborate allegations of Leftwich's criminal conduct undermined the determination of probable cause.

Probable cause requires only a probability of criminal activity, not an actual showing of such activity. *Gates*, 462 U.S. at 243 n. 13, 103 S.Ct. at 2334–35 n. 13. Here, the police corroborated all of the non-criminal information provided by the anonymous informant, including that Leftwich travelled to Kansas City during Spring Break. By itself, this "innocent" activity would not establish probable cause. However, even "seemingly innocent activity [can become] suspicious in light of the initial tip." *Gates*, 462 U.S. at 243 n. 13, 103 S.Ct. at 2334–35 n. 13. Furthermore, the police were able to conclude that a known drug offender visited Leftwich's residence. Under a totality of the circumstances test, all of these factors establish that probable cause existed for the judge to issue the warrant in this case.

### 3.

This case differs little from other cases, with similar facts and levels of police corroboration, in which courts found probable cause. Probable cause existed in *Gates*, which also involved an anonymous letter, and where the police corroborated only the "innocent" activity, namely, the travels of the defendants. In *Draper*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), police received a tip from a reliable informant that the defendant would be dressed a certain way and carrying a tan bag as he disembarked from a train in Denver. There was no corroboration of any criminal activity. Significantly, the police did not obtain a warrant, and probable cause was established in the context of a warrantless search. In *Turcotte–Schaeffer*, we found probable cause existed when a first-time informant provided information similar to the information in this case. There, the informant relayed the first name of one of the defendants, the type of automobile that person drove, and a description of the house and general location, but no address. There, as here, the police tied the automobile to the defendant through state motor vehicle registration information. Police corroborated none of the alleged criminal

activity in that case. In *People v. Pannebaker*, 714 P.2d 904 (Colo.1986), another unanimous decision of this court, we found that probable cause existed based on the information of a first-time informant and without police corroboration of any criminal activity. In *Pannebaker*, the informant related that the defendant was growing marijuana, gave a full description of the residence, and stated that the windows in the second-level "growing room" were covered with a dark window covering. The police verified this information. They also noticed the name "Pannebaker" on the mailbox in front of the house, and ran a driver's license check on the name, from which they obtained a physical description of the defendant and learned he had been arrested for possession and distribution of marijuana.

On the question of establishing whether probable cause exists, I find little difference between the cases described above and this case. The majority finds it significant that, in *Turcotte–Schaeffer*, the informant was known to police. The majority does not note, however, that this was the first time the informant had cooperated with police. A part of the totality of the circumstances test is determining the reputation for veracity and reliability of the confidential informant. In my mind, there is no appreciable difference in this respect between a first-time informant in direct contact with the police and an informant who chooses to remain anonymous.

### C.

Applying the totality of the circumstances test, I would find that there was probable cause for the judge to have issued the warrant in this case. An informant's veracity and reliability, and police corroboration of the informant's information, are all highly relevant; however, "they should be understood simply as closely intertwined issues that may usefully illuminate the common-sense, practical question whether there is 'probable cause.'" *Gates*, 462 U.S. at 230,

*Taube* arose from a violation of the Nuisance Act in which police entered a residence, without a warrant, to seize property for inventory purposes under the Nuisance Act. We held that the Nuisance Act did not authorize a warrantless entry into a person's home to inventory the home's contents.

103 S.Ct. at 2328. A neutral and detached judge issued a warrant in this case, and neither the majority nor the defendant argues that the judge was not neutral or detached. The courts in our system of justice have expressed a strong preference for warrants. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). " '[I]n a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.' " *Leon*, 468 U.S. at 914, 104 S.Ct. at 3416 (quoting *Ventresca*, 380 U.S. at 106, 85 S.Ct. at 744). In *Draper*, the United States Supreme Court found probable cause in a situation very similar to this one, but where, significantly, police had not obtained a search warrant. Under similar facts, with a warrant, probable cause is surely established.

### III.

The majority decides that there is no probable cause to support the issuance of a search warrant, and also holds that the good faith exception to the exclusionary rule does not apply to this case because it was unreasonable for the officer to believe that there was probable cause to support the warrant. I disagree. Assuming, *arguendo*, that probable cause did not exist, I believe that it was reasonable for the officer to rely on the warrant issued by the judge, and would hold that the good faith exception applies to this case.

The exclusionary rule is not itself a constitutional right, but instead is a judicially created means of effectuating the rights secured by the Fourth Amendment. *Stone v. Powell*, 428 U.S. 465, 482, 96 S.Ct. 3037, 3046–47, 49 L.Ed.2d 1067 (1976). Its primary function is to deter violations of the Fourth Amendment. *Id.* at 486, 96 S.Ct. at 3048–49. The exclusionary rule "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Id.* Its application has been restricted to where " 'its remedial objectives are thought most efficaciously served.' " *Id.* at 486–87, 96 S.Ct. at 3049 (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)). The exclusionary rule has been criticized for defeating the truth-finding process and keeping unimpeachable and probative evidence from the trier of fact. *See, e.g., Stone*, 428 U.S. at 490, 96 S.Ct. at 3050. A Fourth Amendment illegal search is unlike a Fifth Amendment *Miranda* violation, where the evidence itself becomes suspect because of the constitutional violation.

The United States Supreme Court formally announced the exception in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 87 L.Ed.2d 677 (1984). The Colorado legislature enacted the good faith exception into law in section 16–3–308, 8A C.R.S. (1986).

The good faith exception is most supportable when police officers have reasonably relied on a judicially issued search warrant. *Gates*, 462 U.S. at 262, 103 S.Ct. at 2345 (White, J., concurring). The officer's reliance on the probable cause determination underlying the warrant must be objectively reasonable. *Leon*, 468 U.S. at 922, 104 S.Ct. at 3420. An officer's reliance is unreasonable when the affidavit used in support of the warrant is " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *Id.* at 923, 104 S.Ct. at 3420–21 (quoting *Brown v. Illinois*, 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)); *see also Gates*, 462 U.S. at 264, 103 S.Ct. at 2346 (White, J., concurring) ("[T]he good-faith exception would not apply if the material presented to the magistrate is ... so clearly lacking in probable cause that no well-trained officer could reasonably have thought that a warrant should issue.").

In determining when a warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," the *Leon* court borrowed language from *Brown v. Illinois*, 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part). In *Brown*, Justice Powell referred to instances that were "lacking in indicia of probable cause" as an example of a "flagrantly abusive violation," and compared them to an arrest "effectuated as a pretext for collateral objectives." *Id.* Justice Powell, and the *Leon* court, therefore, had in mind those extreme, flagrant situations in which police act with no

reasonable basis to believe they had probable cause. It is also instructive to note that *Brown* involved warrantless searches, without advance determination of probable cause by a judge. Since *Leon* involves situations in which a magistrate has found there to be probable cause, the "flagrantly abusive violation" of concern to Justice Powell is less likely to arise. It does not arise in this case.

We must consider whether a reasonably well-trained officer would have known that the search was illegal despite the judge's authorization. *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23. "In making this determination, all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered." *Id.* at 922–23 n. 23, 104 S.Ct. at 3420 n. 23.

Although the fact that a judge issued a warrant is not, by itself, entirely dispositive of whether the police officer acted in good faith and whether his or her reliance on the warrant was reasonable, the *Leon* court suggested that the existence of a warrant plays an important role in that determination. The *Leon* decision cited the report of the Attorney General's Task Force on Violent Crime:

> [T]he situation in which an officer relies on a duly authorized warrant 'is a particularly compelling example of good faith. A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions. Accordingly, we believe that there should be a rule which states that evidence obtained pursuant to and within the scope of a warrant is prima facie the result of good faith on the part of the officer seizing the evidence.'

*Leon*, 468 U.S. at 921, 104 S.Ct. at 3419 (quoting *Attorney General's Task Force on Violent Crime, Final Report* (1981)). "Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." *Stone v. Powell*, 428

U.S. at 498, 96 S.Ct. at 3054 (Burger, C.J., concurring).

The Colorado legislature has enacted a standard even more deferential to the assumption that the actions of a police officer under a warrant are reasonable. The statute states, in pertinent part:

> It shall be prima facie evidence that the conduct of the peace officer was performed in the reasonable good faith belief that it was proper if there is a showing that the evidence was obtained pursuant to and within the scope of a warrant, unless the warrant was obtained through intentional and material misrepresentation.

§ 16–3–308(3)(b), 8A C.R.S. (1986). The majority omits this language from its discussion of the statute, and does not address the burden that the statute imposes on the defendant to overcome the presumption that the officer acted reasonably and in good faith. I believe that, contrary to the majority's assertions, the Colorado statute does apply to this case and establishes a presumption that the officer's reliance on the warrant was reasonable, a presumption that the defendant did not overcome.

The record in this case reveals that the police officer had his affidavit in support of the warrant application approved by his supervisor, the head of the narcotics division; by the police department's legal adviser; and by the chief deputy district attorney. Each told him the affidavit was sufficient to establish probable cause in support of a warrant. Only then did he apply to the judge for a warrant, which was granted. The first judge he approached signed the warrant, the first time he was asked. This is not a case of "judge shopping," which the court in *Leon* noted would be indicative of an unreasonable· reliance on the warrant.

The majority claims it was not reasonable for the officer to rely on the advice of these people, and that the officer knew or should have known the warrant was not supported by probable cause.[5] I find the idea untena-

---

5. This is not a case like *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), quoted and relied on extensively by the majority. There, an officer claimed it was objectively reasonable to believe that probable cause existed, by

relying solely on the fact that a magistrate had issued a warrant. The Supreme Court found that an officer should not rely solely on the fact that a warrant was issued. Here, the officer did not merely rely on the magistrate's decision.

ble that a police officer, untrained in the legal nuances of probable cause, cannot reasonably rely on advice from his supervisor, from two lawyers, one of whom was the chief deputy district attorney, and from a judge, who was also an attorney. Yet, the majority claims that the officer knew or should have known that the warrant was not supported by probable cause. Absent any showing of bad faith on the part of the officer,[6] I fail to see how the majority would expect a police officer to know there is no probable cause in a given situation if the officer cannot reasonably rely on the legal advice of his superiors, the district attorney's office, and a neutral and detached judge.[7]

I disagree with the conclusion reached by the majority on page 1271 of its opinion, which states that, "[f]rom the time Detective Weiler received the letter until he prepared the affidavit, Detective Weiler, the members of the Boulder Police Department, and the District Attorney doubted whether probable cause existed to obtain a warrant." Maj. op. at 1272. I find nothing in the record to suggest that *any* of these parties had doubts that probable cause existed. The officer's unrefuted testimony was that all of these individuals approved the affidavit he submitted to the judge and believed that probable cause had been established. Earlier in the opinion, the majority states: "The Deputy District Attorney advised Detective Weiler that the affidavit presented a close case and that a judge might not sign it." Maj. op. at ———. However, the full statement of the

chief deputy district attorney at the suppression hearing was: "I think what I confided to the officer was I thought that the facts were very close to the point which a judge might not sign it, that reasonable minds could differ on that in essence.... I did sign off on the warrant for the officer claiming my belief there was probable cause."

The police officer's supervisor, the legal adviser to the police department, the chief deputy district attorney, and the judge all believed that probable cause existed. I cannot conclude, as the majority has, that the officer acted unreasonably in his belief that there was probable cause to support the warrant, after the approval of his supervisor, two lawyers, and a judge.

## IV.

The trial court applied the incorrect standard of review to the judge's decision that probable cause supported the issuance of a search warrant. A reviewing court does not review a judge's determination of probable cause de novo; the determination is entitled to great deference. *Spinelli*, 393 U.S. at 410, 89 S.Ct. at 584. "We have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331. Reasonable minds may differ on the question of whether a particular affidavit establishes probable

---

Rather, he exercised his professional judgment, as was recommended in *Briggs*, and sought the advice of his supervisor, the legal adviser to the police department, and the chief deputy district attorney.

6. The trial court specifically found that the officer had not acted in bad faith when he obtained the warrant.

7. The majority cites *United States v. Baker*, 894 F.2d 1144 (10th Cir.1990), for the proposition that a police officer may not rely on a magistrate's finding of probable cause. In *Baker*, a county deputy sheriff, after unsuccessful efforts to contact a federal magistrate to obtain a search warrant for a residence within Indian tribal land, obtained a warrant from a state court judge, but only after disclosing to the state court his doubts as to jurisdiction on the Indian reservation. The Tenth Circuit held that execution of the invalid warrant was not within the good faith exception.

The majority misinterprets the precedent of that case. Because it held that the police officer should have known that the search was not supported by probable cause, the court ruled that it "need not and [did] not decide precisely what favorable weight may be given to an officer's reliance on a judicial official's opinion." *Id.* at 1149 n. 3.

I believe the majority makes an unacceptable leap of logic when it reasons that, because courts have ruled that a police officer may not rely solely on the opinion of the magistrate on probable cause, the officer would also be unreasonable in relying on the opinions of his superiors in the police department, on attorneys in the police department, and on attorneys in the district attorney's office. Maj. op. at 1269–1270 n. 11. Such a conclusion will result in the obliteration of the good faith exception to the exclusionary rule.

cause. *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1983). "Doubts must be resolved in favor of magistrates' determinations of probable cause." *People v. Abeyta,* 795 P.2d 1324, 1327 (Colo.1990). The task of a reviewing court is to ensure that a judge had a substantial basis for concluding that probable cause existed. *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33.

The record reveals that the district court inappropriately reviewed the probable cause determination de novo and substituted its own judgment as to whether probable cause existed. In the district court's oral ruling, the judge stated: "I absolutely cannot find that when a particular described person gets in a particular described car and takes a trip to Kansas City over spring break, I'm feeling highly suspicious and feeling his conduct is indicative of criminal behavior."

The *Gates* court provided examples in which a reviewing court would find no substantial basis for a magistrate's finding of probable cause. They involved "bare bones" affidavits that supported warrants. The majority concluded that the affidavit in this case was of the "bare bones" type. However, the majority misinterprets the United States Supreme Court's characterization of "bare bones" affidavits. According to that court, a "bare bones" affidavit is one supported by wholly conclusory statements that are not corroborated. *Gates,* 462 U.S. at 239, 103 S.Ct. at 2332–33. In *Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933), the affiant swore that " 'he has cause to suspect and does believe' " that liquor was illegally brought into the United States. *Gates,* 462 U.S. at 239, 103 S.Ct. at 2332–33 (quoting *Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933)). Similarly in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), a warrant was issued solely on an officer's statement that " '[a]ffiants have received reliable information from a credible person and do believe' that heroin is stored in a home." *Gates,* 462 U.S. at 239, 103 S.Ct. at 2332–33 (quoting *Aguilar,* 378 U.S. at 109, 84 S.Ct. at 1511). The affidavit tendered in this case does not resemble the affidavits in these

other examples. It is not a "bare bones" affidavit because it does not consist of wholly conclusory statements and because it was supported by facts and by corroboration of those facts. It provides a substantial basis for the judge's finding of probable cause.

Accordingly, I believe we should defer to the judge's finding that probable cause was established in this case.

## V.

This court, and others, including the United States Supreme Court, have sought to limit the application of the exclusionary rule to situations in which it is used to achieve deterrence. In these situations, the police have either acted in bad faith or in the objectively unreasonable belief that probable cause existed for their actions. "We ... conclude that suppression of evidence obtained pursuant to a warrant should be ordered ... only in those unusual cases in which exclusion will further the [deterrence] purposes of the exclusionary rule." *Leon,* 468 U.S. at 918, 104 S.Ct. at 3418. "The policy of deterrence is not furthered if the police believe in good faith that their conduct is lawful and reasonable." *People v. Sporleder,* 666 P.2d 135, 150 (Colo.1983) (Erickson, J., dissenting).

If there was any error in this case, it was committed by the judge who reviewed the affidavit, not by the police officer who prepared it. Given there was no showing of bad faith on the part of the police department, the majority inappropriately places the blame on the officer, not the judge. "It is the responsibility of the judge, and not the officer, to examine an affidavit to insure that it complies with constitutional requirements." *People v. Deitchman,* 695 P.2d 1146, 1154–55 (Colo.1985) (Erickson, J., concurring).

Punishing the police officer for the judge's mistake will not further the policy of deterrence. "To suppress the evidence in this case would serve only to punish the detective for the judge's error and would not contribute to the deterrence of unconstitutional police activity." *Id.* at 1155. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the

deterrence of Fourth Amendment violations." *Leon,* 468 U.S. at 921, 104 S.Ct. at 3419. Especially when the officer's conduct is objectively reasonable, as I believe it was, suppressing the evidence will not further the purposes of the exclusionary rule. *See Leon,* 468 U.S. at 919–20, 104 S.Ct. at 3418–19. When a magistrate makes errors of this nature or serves as a rubber stamp for police, the *Leon* court suggested that "closer supervision or removal [of the magistrate] provides a more effective remedy than the exclusionary rule." *Id.* at 917–18 n. 18, 104 S.Ct. at 3418 n. 18. I do not believe that suppressing the evidence in this case will deter future mistakes by police officers.

### VI.

For reasons discussed above, I believe that this case fits squarely within section 16–3–308. The majority dismisses the application of the statute to this case in fewer than two pages, stating that, because the officer's belief was not reasonable, his actions do not fall under the good faith exception to the exclusionary rule.

However, I believe the statute requires more analysis. "Good faith mistake" is defined in the statute as "a reasonable judgmental error concerning the existence of facts *or law* which if true would be sufficient to constitute probable cause." § 16–3–308(2)(a) (emphasis added). I have already discussed the statutory presumption of good faith that exists when a judge has issued a warrant. In amending the statute to include mistakes of law, the legislature sought to address our ruling in *People v. Quintero,* 657 P.2d 948 (Colo.1983). In *Quintero,* the prosecution claimed that an officer's mistake that probable cause existed was covered under the good faith exception of section 16–3–308. We disagreed and ruled that the statute only addressed mistakes of fact, not of law. The legislature then amended the statute to specifically include mistakes of law. I believe that the statute should be applied in this case and the officer's belief that there was probable cause, if it was mistaken, accorded an exception to the exclusionary rule under section 16–3–308.

The district court ruled that section 16–3–308 did not apply to this case because of our decision in *Quintero.* However, the district court apparently did not realize that the statute had been amended since our holding in that case, with the goal of including mistakes of law as well as mistakes of fact. The district court's reliance on the holding of *Quintero* was in error; however, this error was not addressed by the majority opinion.

### VII.

I believe that the warrant issued by the judge was supported by probable cause. Even if probable cause had not been established, the search should be upheld under the good faith exception to the exclusionary rule, enunciated by the United States Supreme Court in *Leon* and by the Colorado legislature in section 16–3–308, because it was reasonable for the police officer to believe that probable cause did exist.

I am authorized to say that Chief Justice ROVIRA joins in this dissent.

