Bernard HENDERSON, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 93SC339.

Supreme Court of Colorado,
En Banc.

June 13, 1994.

Rehearing Denied July 25, 1994.

David F. Vela, Colorado State Public Defender, Douglas D. Barnes, Deputy State Public Defender, Denver, for petitioner.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Roger G. Billotte, Asst. Atty. Gen., Denver, for respondent.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *People v. Henderson*, 847 P.2d 239 (Colo.App.1993), which involved the observations of a police officer from a television news helicopter of marijuana plants on residential property. The court of appeals held that the helicopter flight over the defendant's property was not a search and that the warrant to search the defendant's property was supported by probable cause. On appeal, the defendant claims that the court of appeals erred in determin-ing that the news reporter who flew the helicopter could assert the Colorado statutory newsperson's privilege and therefore was not required to testify at a suppression hearing. We affirm the judgment of the court of appeals.

I

In July, 1989, Officer Greg Bohlen, an undercover narcotics investigator for the South Metro Task Force, received an anonymous telephone call. The caller informed Officer Bohlen that Bernard Henderson had recently cultivated and sold marijuana from his residence at 4466 West Bowles Avenue in Littleton. The caller also stated that he observed $5,000 in cash, scales that are commonly used to weigh marijuana, and a number of weapons. Based on this information, Officer Bohlen placed the residence under surveillance for several days but did not observe any illegal activity.

On September 7, 1989, Detective Daniel F. Rupp received an anonymous call implicating Henderson in illegal activities. The caller indicated that Henderson lived at 4466 West Bowles Avenue, that there was Chevy pickup truck and a Harley Davidson motorcycle parked at the residence, and that marijuana was being grown in a shed behind the house. Detective Rupp conveyed this information to Officer Bohlen and the two officers went to the residence, walked around it, but saw nothing unusual.

Prior to September 8, 1989, Officer Bohlen had attempted to secure the use of a helicopter for a fly-over of another location in an unrelated investigation. When he was unable to obtain a law-enforcement helicopter, Officer Bohlen entered into an agreement for the use of a helicopter operated by television station KUSA Channel 9. KUSA agreed to provide a helicopter to Officer Bohlen and Agent Dan Johnson so that the officers could take photographs of the location in exchange for the right to report on the drug investigation.

On September 8, the morning Officer Bohlen was to participate in the fly-over of the unrelated property, he received another anonymous telephone call from the same call-

er regarding the alleged drug activity at 4466 West Bowles. The informant again indicated that he had been to the property and that Henderson was growing marijuana in a shed behind his house. The informant stated that Henderson retrieved a five-foot-tall marijuana plant from the shed and sold it to the informant's companion for $500. Additionally, the caller informed Officer Bohlen that he was aware of a substantial drug deal that took place at Henderson's residence a week prior to the call and that Henderson had automatic weapons in his house. As a result of the calls of the anonymous informant, Officer Bohlen asked the helicopter pilot for KUSA, Peter Peelgrane, if Peelgrane would fly him over Henderson's house. Peelgrane agreed to fly over Henderson's house after flying over the property that was the subject of the unrelated investigation.

Officer Bohlen, Peelgrane, Agent Johnson, and a photographer for KUSA made four or five passes over Henderson's residence during a period of approximately five minutes. Officer Bohlen observed a shed to the south of the residence with a plastic roof "with green plant material growing underneath the plastic." Officer Bohlen stated that the helicopter stayed between 500 and 700 feet in altitude. He based his altitude estimate on his experience flying in helicopters. Although he could not describe the plants in detail, based on his special education in drug identification and on his law enforcement experience, Officer Bohlen concluded that the plants were marijuana. Photographs were taken by the two police officers. Additionally, video tape was taken by the KUSA news photographer and was subsequently used in a news broadcast.

At about four o'clock on that same day, the anonymous caller telephoned again and told Officer Bohlen that Henderson had seen the helicopter fly over his residence and had ended his illegal gardening pursuits by uprooting and moving the marijuana plants.

The authorities subsequently obtained a no-knock search warrant and seized evidence, including roots, stalks, leaves, and other remnants of marijuana as well as culti-

vation equipment and fertilizer. Guns, scales, plastic bags, a pipe, and a bag of marijuana were found inside the house.

On October 31, 1989, a felony complaint was filed in Arapahoe County Court charging Henderson with one count of cultivation of marijuana,[1] and one count of conspiracy to cultivate marijuana.[2] Henderson pleaded not guilty on April 20, 1990.

Prior to trial, Henderson issued a subpoena to Peelgrane in an attempt to elicit testimony from him at a hearing on a motion to suppress evidence. Counsel for KUSA and Peelgrane moved to quash the subpoena, invoking the newsperson's privilege set forth in section 13–90–119, 6A C.R.S. (1993 Supp.). The trial court held that the privilege applied and quashed the subpoena. At the conclusion of the suppression hearing, the trial court denied Henderson's motion to suppress.

Trial to a jury commenced on August 22, 1990, and on August 30, 1990, the jury returned a verdict of guilty on both charges. On December 19, 1990, the trial court sentenced Henderson to eight years on the substantive count and four years on the conspiracy count with the sentences to run concurrently.

Henderson appealed and the court of appeals affirmed the convictions. The court of appeals held that the fly-over by the KUSA helicopter did not constitute a search under either the Fourth Amendment to the United States Constitution or article II, section 7 of the Colorado Constitution, that the search warrant issued was not infirm, and that Peelgrane was protected from giving testimony by the newsperson's privilege. *People v. Henderson*, 847 P.2d 239 (Colo.App.1993).

II

The court of appeals held that the fly-over was not a search under the Fourth Amendment to the United States Constitution and did not violate article II, section 7 of the Colorado Constitution. *Henderson*, 847 P.2d

1. § 18–18–106(8), 8B C.R.S. (1986).

2. § 18–2–201, 8B C.R.S. (1986).

at 241. Under the facts of this case, we agree.

### A

■ The Fourth Amendment protects: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "The basic purpose of this Amendment ... is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Therefore, warrants are generally required before a governmental agency or official may conduct a search. *See United States v. Karo*, 468 U.S. 705, 714–15, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984) (stating that warrantless searches are presumptively unreasonable).

■ A warrant is only required, however, when a search occurs. A search occurs when the government intrudes on an area where a person has a "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).[3] *See also California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986) (stating that a reasonable expectation of privacy is one that "society [is] willing to recognize ... as reasonable"); *Karo*, 468 U.S. at 712, 104 S.Ct. at 3302 ("A 'search' occurs 'when an expectation of priva-

cy that society is prepared to recognize as reasonable is infringed.'") (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). In order to determine whether the expectation of privacy is reasonable or "what expectations of privacy are constitutionally 'justifiable,'" *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971), the facts and circumstances of each case must be analyzed to determine if the defendant's expectation of privacy is objectively reasonable. *See Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984) (concluding that no single factor determines whether an individual legitimately may assert a claim under the Fourth Amendment that he should be free from governmental intrusion); *United States v. Fisch*, 474 F.2d 1071, 1077–78 (9th Cir.1973) ("The test applied as to society's tolerance of the search rests, as it has for years, upon 'the facts and circumstances—the total atmosphere of the case.' There is no ready formula, 'each case is to be decided upon its own facts and circumstances.'") (footnotes omitted); *Hoffman v. People*, 780 P.2d 471, 474 (Colo.1989) ("The existence of a legitimate expectation of privacy must be determined after examining all the facts and circumstances in each particular case.").

The United States Supreme Court applied the totality of the facts and circumstances standard to determine if a defendant had a reasonable expectation of privacy in *Florida*

---

3. Although both subjective and objective expectations of privacy have been considered when determining whether the defendant had a constitutionally protected reasonable expectation of privacy, *see Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *see also California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986); *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *United States v. Miller*, 425 U.S. 435, 442, 96 S.Ct. 1619, 1623, 48 L.Ed.2d 71 (1976); *People v. Hillman*, 834 P.2d 1271, 1273 (Colo.1992); *Hoffman v. People*, 780 P.2d 471, 474 (Colo.1989), *but see United States v. White*, 401 U.S. 745, 786, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting) (stating that the court must transcend the "search for subjective expectations"

inasmuch as subjective expectations are inextricably linked to a determination of whether society considers the expectation reasonable); *United States v. Taborda*, 635 F.2d 131, 137 (2d Cir. 1980) (declaring that "a purely subjective criterion is not appropriate," as by "use of a subjective test ... it would be possible for the government by edict or known systematic practice to condition the expectations of the populace in such a way that no one would have any real hope of privacy"); *United States v. Fisch*, 474 F.2d 1071, 1077 (9th Cir.1973) (noting that a defendant often manifests an expectation of privacy when he attempts to conduct illicit activity); 1 Wayne R. LaFave, *Search and Seizure* § 2.1(c) (1987), under the facts in this case, the subjective inquiry is not controlling inasmuch as we hold that Henderson's expectation of privacy is not one society is prepared to recognize as reasonable.

v. Riley, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1988). In Riley, the Court determined that police observing the defendant's backyard from a helicopter flying at 400 feet did not conduct a search for Fourth Amendment purposes.

The defendant in Riley lived in a mobile home located on five acres of property. Near the mobile home was a greenhouse that was obscured from view by a fence, trees, and shrubs. The contents of the greenhouse, however, were visible from above because two panels of the roof were missing. As the result of an anonymous tip, a police helicopter made two passes over the property at an altitude of 400 feet. The observing officer viewed what he thought was marijuana growing in the greenhouse. Based on the police officer's observations and the anonymous tip, a search warrant was obtained and executed, and marijuana was found and seized. The Court held that the actions of the police officer did not constitute a search within the meaning of the Fourth Amendment. Id. at 450, 109 S.Ct. at 697.

A plurality of the Court concluded that one of the primary factors in determining whether the defendant's expectation of privacy was unreasonable was that the helicopter was flying in navigable airspace within the Federal Aviation Administration (FAA) guidelines.[4] Id. at 451, 109 S.Ct. at 697. Thus, the Court relied on the fact that the observation itself was legal. In Ciraolo, the Supreme Court addressed the issue of the legality of a flyover. The Court held that an aircraft used to view the defendant's backyard did not violate the defendant's reasonable expecta-

tion of privacy because the police were in legal airspace at an altitude of 1,000 feet viewing what any member of the public could observe from an aircraft. The Court stated:

> The observations by Officers Shutz and Rodriguez in this case took place within public navigable airspace.... That the observation from aircraft was directed at identifying the plants and the officers were trained to recognize marijuana is irrelevant.... Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed.... [The defendant's] expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor.

Ciraolo, 476 U.S. at 213–14, 106 S.Ct. at 1812 (footnote omitted).

■ The Court in Riley also considered whether the defendant had a reasonable expectation of privacy based upon the intrusiveness of the observations. The Court held that there was only a minimal intrusion. The Court stated:

> Neither is there any intimation here that the helicopter interfered with respondent's normal use of the greenhouse or other parts of the curtilage. As far as the record reveals, no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury.

Riley, 488 U.S. at 452, 109 S.Ct. at 697. The fact that the helicopter circled twice over Riley's residence and curtilage[5] was not

4. In her concurring opinion, Justice O'Connor states that the controlling factor should not be that the helicopter had a right to be over the defendant's property but whether the "helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that [the defendant's] expectation of privacy was not 'one that society is prepared to recognize as reasonable.'" Florida v. Riley, 488 U.S. 445, 454, 109 S.Ct. 693, 699, 102 L.Ed.2d 835 (1988) (O'Connor, J., concurring) (quoting Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). The plurality, however, did not base its decision solely on the fact that the helicopter was flying in accordance with FAA standards. According to the plurality:

> This is not to say that an inspection of the curtilage of a house from an aircraft will al-

ways pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law. But it is of obvious importance that the helicopter in this case was not violating the law, and there is nothing in the record or before us to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to [the defendant's] claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude.

Riley, 488 U.S. at 451–52, 109 S.Ct. at 697.

5. Curtilage is the inclosed space and buildings directly surrounding a residence. See United States v. Dunn, 480 U.S. 294, 299–301, 107 S.Ct. 1134, 1138–40, 94 L.Ed.2d 326 (1987); Hoffman v. People, 780 P.2d 471, 472 (Colo.1989); see also

found to increase the intrusiveness of the observation to such a degree as to constitute a search.[6] In a broad sense, *Riley* and *Ciraolo* recognize that ordinary unintrusive visual observations from public navigable airspace do not constitute a search under the Fourth Amendment.

Based on these considerations, the Court in *Riley* held that the defendant's expectation of privacy in the contents of the greenhouse was not one that society would recognize as reasonable.

## B

■■■■ The instant case presents issues similar to those presented in *Riley*. First, according to the evidence, the KUSA helicopter was flying at an altitude of between 500 and 700 feet, which is a permissible altitude under current FAA regulations. *See* 14 C.F.R. § 91.79 (1988). In an affidavit in

support of his motion to quash the subpoena, Peelgrane avers that he complied with all FAA regulations. Henderson presented no evidence that the use of the helicopter constituted a violation of FAA regulations.[7]

■■■■ The critical aspect of this analysis is not the number of times the helicopter passed over the residence, *Riley*, 488 U.S. at 445, 109 S.Ct. at 693 (implying it was not dispositive that the helicopter circled twice), or the fact that it was a helicopter and not a fixed-winged aircraft, *id.* at 450, 109 S.Ct. at 696–97 (stating that the type of aircraft was not dispositive), or how often either military or civilian aircraft passed over the residence during the course of a year, *id.* at 451, 109 S.Ct. at 697 (noting that the greenhouse was not protected from "public or official observation"); rather, it is the fact that the marijuana was in plain view to anyone legally viewing the shed from the helicopter.[8]

---

*California v. Ciraolo*, 476 U.S. 207, 212, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986) ("At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' ") (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886))).

6. In several other cases in which courts have analyzed whether a search occurred or if a warrant was required for a search, ·the degree of intrusiveness of the observation has been crucial to the court's determination of whether the warrantless observation was reasonable. *See California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (noting that "a search of a paper bag intrudes far less on individual privacy than does the incursion sanctioned in *Carroll [v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)], where prohibition agents slashed a car's upholstery"); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453, 110 S.Ct. 2481, 2486, 110 L.Ed.2d 412 (1990) (recognizing that the circumstances surrounding a checkpoint stop and search are much less intrusive than the circumstances surrounding a roving-patrol stop); *United States v. Sokolow*, 490 U.S. 1, 17 n. 4, 109 S.Ct. 1581, 1591 n. 4, 104 L.Ed.2d 1 (1989) (Marshall, J. dissenting) ("[T]he manner in which a search is carried out—and particularly whether law enforcement officers have taken needlessly intrusive steps—is a highly important index of reasonableness under Fourth Amendment doctrine."); *Winston v. Lee*, 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1984) quoting *Schmerber v. California*, 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966) ("[T]he

[Fourth] Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in the improper manner."); *Oliver v. United States*, 466 U.S. 170, 179, 104 S.Ct. 1735, 1741–42, 80 L.Ed.2d 214 (1984) (stating that there is a diminished expectation of privacy of property in an open field because an open field does not "provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance"); *United States v. Taborda*, 635 F.2d 131, 138–39 (2d Cir.1980) ("The vice of telescopic viewing into the interior of a home is that it risks observation not only of what the householder should realize might be seen by unenhanced viewing, but also of intimate details of a person's private life.").

7. As the court of appeals notes, the defendant carries the burden of demonstrating that a search has taken place. *See Riley*, 488 U.S. at 451–52, 109 S.Ct. at 697 (stating that the record did not establish enough facts to demonstrate that a search occurred); *Id.* at 455, 109 S.Ct. at 699 (O'Connor, J., concurring) (noting that Riley introduced no evidence to show that flights at 400 feet are rare). The burden of proving an exception to the warrant requirement after a warrantless search has occurred, however, is on the prosecution. *Hoffman*, 780 P.2d at 474.

8. This analysis is analogous to the Fourth Amendment plain view analysis. In determining whether someone is observing something in plain view and therefore not conducting a "search" within the meaning of the Fourth Amendment, it is not determinative if the observer is walking

Second, the observation posed only a very limited degree of intrusiveness. The helicopter made approximately five passes over Henderson's property over the course of several minutes and never flew below an altitude of 500 feet.[9] There is little evidence of the noise, wind, dust, threat of injury, or interference with the use of the curtilage. In addition, the trial court found that there was no indication that other people in the neighborhood found the fly-over significantly intrusive to cause Henderson's neighbors to come out of their homes in response to the helicopter.[10] Cf. People v. Pollack, 796 P.2d 63, 65 (Colo.App.1990) (noting that during a fly-over at 200 feet, the noise from the helicopter caused six of the defendant's neighbors to look at the helicopter).

After examining all of the relevant criteria, the totality of the circumstances indicates that Henderson did not have a reasonable expectation of privacy in his marijuana and therefore the fly-over did not constitute a search under the Fourth Amendment to the United States Constitution. Accordingly, we affirm the court of appeals on the Fourth Amendment issue.

## C

■ Having determined that the fly-over was not a warrantless search proscribed by the Fourth Amendment to the United States Constitution, we review the claim of a violation of article II, section 7 of the Colorado Constitution. The additional analysis of the Colorado Constitution is necessary because the issue is one of first impression before this court.

Although this court, in construing article II, section 7 of the Colorado Constitution, has interpreted our state constitution as more protective of certain rights of privacy than some United States Supreme Court decisions addressing similar factual situations on Fourth Amendment search and seizure issues, see People v. Oates, 698 P.2d 811, 815–16 (Colo.1985) (beepers in commercially purchased items); People v. Corr, 682 P.2d 20, 27–28 (Colo.), cert. denied, 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984) (telephone toll records); People v. Sporleder, 666 P.2d 135, 140 (Colo.1983) (telephone phone records); Charnes v. DiGiacomo, 200 Colo. 94, 100, 612 P.2d 1117, 1121 (1980) (bank records), we see no reason to do so in this case.

We have held that a legitimate expectation of privacy is one that society considers reasonable. People v. Hillman, 834 P.2d 1271, 1273 (Colo.1992). We have also held that "the mere observation by government officials of that which is plainly visible to anyone does not constitute a search for constitutional purposes." Hoffman, 780 P.2d at 473. Additionally, when analyzing search and seizure issues under both the federal and state constitutions, we have held that "in general, a

---

quickly or slowly, passes the object of view one time or five times, or even shines a flashlight on the object; the essential determination is whether the object is in plain view to someone who is lawfully present. See Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) (stating that police may seize evidence in plain view without a warrant if the police are lawfully present when they view the object seized); see also Dunn, 480 U.S. at 305, 107 S.Ct. at 1114 (stating that it was not an unreasonable search to illuminate the inside of a barn with a flashlight to inspect the contents of the barn); United States v. Garner, 907 F.2d 60, 62 (8th Cir.1990) (concluding that there was no search when the officer investigating a burglary complaint shined his headlights into a garden adjacent to the residence and observed marijuana plants); United States v. Martinez–Miramontes, 494 F.2d 808, 810 (9th Cir.1974) (holding in a "plain smell" context that there was "no distinction in the use of the olfactory organs whether the revealing odor is detected in a stroll

around the car or by a sniff over the trunk compartment"); United States v. Fisch, 474 F.2d 1071, 1078 (9th Cir.1973) (noting that it was not a search when a police officer overheard a conversation held in a hotel room by lying down and placing his ear against the crack between the door and the floor).

9. The Riley court did not view as significant the fact that there was more than one pass over the property.

10. The trial court found that Henderson's coming out of his house and then leaving the area as a result of the fly-over was not because of the noise of the helicopter, but because someone was observing his illegal marijuana plants. The presence of the helicopter was noticed by Henderson and testimony indicated that the presence of the helicopter precipitated the removal of the marijuana plants from the shed and Henderson's flight from his residence.

curtilage is not protected from observations that are lawfully made from outside its perimeter not involving physical intrusion," and cited *Riley* and *Ciraolo* with approval. *Hoffman,* 780 P.2d at 474.

■ Henderson did not establish that the fly-over was so intrusive that it constituted a search. Accordingly, we hold that there was no search for purposes of article II, section 7 of the Colorado Constitution. Because the protections of article II, section 7 of the Colorado Constitution do not extend to investigative activity that does not amount to a search, *Hillman,* 834 P.2d at 1273, we affirm the court of appeals.

### III

Henderson claims that the affidavit submitted by Officer Bohlen was insufficient to support a finding of probable cause. Henderson asserts that the search warrant therefore was not valid and that the evidence that resulted from the search of his residence should be suppressed. We disagree.

■ To support the issuance of a search warrant, the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution require probable cause and an oath or affirmation particularly describing the place to be searched and the objects to be seized. *People v. Leftwich,* 869 P.2d 1260, 1265 (Colo. 1994). Probable cause for a search warrant exists when the affidavit in support of the warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or other evidence of criminal activity is located at the place to be searched. *Bartley v. People,* 817 P.2d 1029, 1033 (Colo. 1991). To determine if probable cause exists, the totality of the facts and circumstances known to the officer at the time of the search must be considered. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).[11]

■ The magistrate's probable cause determination is given great deference and is not reviewed de novo. *Spinelli v. United States,* 393 U.S. 410, 416–17, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969); *Leftwich,* 869 P.2d at 1266. In reviewing of the determination of probable cause, we must be satisfied that the magistrate had a substantial basis to rule that probable cause existed. *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332; *People v. Abeyta,* 795 P.2d 1324, 1327 (Colo.1990).

■ Officer Bohlen's affidavit relied on two types of information to establish probable cause: the anonymous informant's tips and the information obtained from airborne observations. Under the totality of the circumstances known to Officer Bohlen at the time of the search, there was probable cause to issue a search warrant.

■ Under some circumstances, an anonymous informant's tip alone will not satisfy the probable cause requirement. *See Leftwich,* 869 P.2d at 1266; *People v. Diaz,* 793 P.2d 1181, 1184–85 (Colo.1990). However, tips from an anonymous informant that have additional indicia of reliability or those that are corroborated may provide a substantial basis for a determination of probable cause. *See People v. Paquin,* 811 P.2d 394, 398 (Colo.1991); *Abeyta,* 795 P.2d at 1328–29. "Corroboration of an anonymous tip with facts learned by an investigating officer is sufficient for the practical, common-sense judgment called for in making a probable cause determination." *Diaz,* 793 P.2d at 1183.

■ In this case, there were four anonymous tips. The informant described Henderson's activities in detail as well as property located at the Henderson residence. The caller specifically told Officer Bohlen that Henderson was growing marijuana in a shed near Henderson's residence and that the informant had seen the marijuana. Although a "bare assertion of knowledge is not sufficient to establish an informer's basis of knowledge," *Leftwich,* 869 P.2d at 1266, Officer Bohlen corroborated the information with his own observations that marijuana was be-

---

**11.** This court has adopted the totality-of-the-circumstances test formulated in *Gates* in applying the search and seizure principles espoused in the Colorado Constitution. *People v. Pannebaker,* 714 P.2d 904, 907 (Colo.1986).

ing cultivated at the Henderson residence.[12] Due consideration should be given to a law enforcement officer's experience and training in evaluating the significance of the officer's observations relevant to probable cause. *Bartley*, 817 P.2d at 1033. Additionally, although observation of plants growing in a shed may seem innocuous to an ordinary observer, this fact does not diminish the significance the observation would have to an officer trained and experienced in drug enforcement. *People v. Hill*, 690 P.2d 856 (Colo.1984).

In this case, the four independent, anonymous tips were specifically detailed and were corroborated through independent police observations. Additionally, the veracity of the tips was confirmed. Application of the totality-of-the-circumstances test announced in *Gates* establishes that there was a substantial basis for concluding Henderson was engaged in illegal activity and that drugs would be found at his property. Accordingly, we affirm the judgment of the court of appeals on the sufficiency of the affidavit supporting the search warrant.

## IV

Henderson's final contention is that Peelgrane is not entitled to newsperson's immunity and therefore must testify at the suppression hearing regarding the altitude and flight pattern of the KUSA helicopter. In this case, the record indicates that Peelgrane is entitled to the statutory newsperson's immunity and that Henderson has not met the burden of proving an exception to the immunity. Accordingly, we affirm the court of appeals.

### A

Section 13–90–119, 6A C.R.S. (1993 Supp.), which provides a "privilege for [a] newsper-

son," grants immunity to newspersons from testifying except under limited circumstances:

> [N]o newsperson shall, without such newsperson's express consent, be compelled to disclose ... any news information received, observed, procured, processed, prepared, written or edited by a newsperson, while acting in the capacity of a newsperson. . . .

§ 13–90–119(2), 6A C.R.S. (1993 Supp.). The statute broadly defines "newsperson" to include any member of the mass media and/or any employee who is engaged to "gather, receive, observe, process, prepare, write, or edit news information." § 13–90–119(1)(c), 6A C.R.S. (1993 Supp.).

For purposes of the statute, Peelgrane was acting as a "newsperson" when he piloted the helicopter. § 13–90–119(1)(c), 6A C.R.S. (1993 Supp.). Peelgrane was employed by KUSA as a full-time reporter and his reports were regularly featured on KUSA news broadcasts. KUSA assigned Peelgrane to observe and gather information regarding the police attempts to uncover illegal drug activity. Although Peelgrane was also the helicopter pilot who flew the police officers over the Henderson property, he was acting as a newsperson as defined by subsection (1)(c), and not as a police agent.

### B

The statute defines "news information" as:

> [A]ny knowledge, observation, notes, documents, photographs, films, recordings, videotapes, audiotapes, and reports, and the contents and sources thereof, obtained by a newsperson while engaged as such,

---

12. According to Officer Bohlen's affidavit:

Your Affiant observed a wood structured shed to the south of the home and west of the garge [sic] which was in the same area that the caller advised Henderson obtained a five foot Marihuana plant from. Your Affiant observed through the clear plastic a green leafy plant which is consistent with the cultivating of Marihuana. The plants appeared to be pushing against the clear plastic cover. Your Affiant was above five hundred feet of the house.

Your Affiant was able to take some aerial photographs, and specific photographs of the plants. Your Affiant believes that the plants are Marihuana based on the above information of the anonymous caller and from his Police experience. Your Affiant has been to an 80 hour Drug identification and recognition School put on by the Drug Enforcement Administration. Your Affiant has seen Marihuana on numerous occasions and believes the plants to be Marihuana.

whether such items have been provided to or obtained by such newsperson in confidence.

§ 13–90–119(1)(b), 6A C.R.S. (1993 Supp.).

The information garnered by Peelgrane falls within the statutory definition of "news information." § 13–90–119(1)(b), 6A C.R.S. (1993 Supp.). Henderson sought to have Peelgrane reveal the altitude of the helicopter and its flight path to help establish that Officer Bohlen was conducting a search. Peelgrane's observations and knowledge of the altitude and flight path of the helicopter are protected by subsection (1)(b). Statutory privileges must be strictly construed. *People v. District Court,* 743 P.2d 432, 435 (Colo. 1987).

### C

Although the newsperson's privilege is broad, the statute also sets forth several situations in which the privilege does not apply. For instance, section 13–90–119(2)(a) through (d) provides that the privilege of nondisclosure does not apply to information that is: (1) received at a press conference; (2) published or broadcast;[13] (3) based on a newsperson's personal observation of a crime, when such information cannot be reasonably obtained through other means; and (4) based on a newsperson's observations of a class 1, 2, or 3 felony.

In addition to the specific instances in which the newsperson's privilege does not apply, the statute provides a method to subpoena a newsperson at a hearing on a newsperson's motion to quash the subpoena. In order to defeat the privilege, the party issuing the subpoena must show, by a preponderance of the evidence, that: (1) the information sought from the newsperson is "directly relevant to a substantial issue involved in the proceeding," (2) the information "cannot be obtained through any other reasonable means," and (3) a strong interest of the party

issuing the subpoena outweighs the interests of the newsperson and the public under the First Amendment to the United States Constitution. § 13–90–119(3), 6A C.R.S. (1993).

In this case, Henderson has failed to show that he could not obtain the evidence requested from some other reasonable means.[14] For example, the question of whether the airspace over Henderson's property was restricted, or was a no-fly zone, could be answered by calling an FAA official to testify or by subpoenaing FAA records. Additionally, testimony regarding the altitude of the helicopter was given by both Henderson and Officer Bohlen. In fact, Officer Bohlen testified that during the flight, the altitude was discussed and that the helicopter's altitude was at all times between 500 and 700 feet. Officer Bohlen also stated that he was experienced with helicopters and was able to estimate altitude.

Given that Peelgrane was operating as a newsperson, his observations and knowledge of the flight path taken to the area, and the altitude of the helicopter, were protected under the statute. The record reflects that Henderson did not meet his burden of establishing that the privilege should be waived or limited. Because we hold that Peelgrane is entitled to the newsperson's privilege in this case and that Henderson failed to meet his burden of proof to overcome the privilege, the trial court did not err by granting Peelgrane's motion to quash the subpoena summoning him to testify at the suppression hearing.

### V

Under the facts of this case, the fly-over did not constitute a search, the warrant was valid, and Peelgrane was properly granted

---

**13.** This limitation provides that the privilege is waived in regard to information actually published or broadcast in a news report, but *not* to any other unpublished or nonbroadcast information on which the report is based. § 13–90–119(4), 6A C.R.S. (1993 Supp.).

**14.** The trial court also found that the interest of the First Amendment outweighed Henderson's interest in eliciting the testimony. Because we hold that Henderson failed to show that the information could not reasonably be obtained through some other source, we do not need to balance Henderson's interest against the interest of the public under the First Amendment.

newsperson's immunity. Accordingly, we affirm the judgment of the court of appeals.

LOHR, J., dissents, and KIRSHBAUM, J., joins in the dissent.

Justice LOHR dissenting:

The majority holds that police inspection of a residential property by use of a helicopter that made four or five passes over that property, hovered in place, and provided vantage points from which police officers took a number of photographs of the property did not constitute a search within the meaning of the Fourth Amendment to the United States Constitution or Article II, Section 7, of the Colorado Constitution. The majority therefore approves the inclusion of information gained by that inspection in an affidavit used to obtain a search warrant for the property. Consequently, it affirms the judgment of the Colorado Court of Appeals upholding the trial court's denial of the defendant's motion to suppress evidence obtained by a search of the property by officers who entered onto the property under authority of the warrant. See People v. Henderson, 847 P.2d 239 (Colo. App.1993). Because I conclude that the aerial inspection constituted a warrantless search proscribed by both the federal and state constitutions, and that the information gained by that search was essential to support the issuance of the search warrant, I respectfully dissent to parts II and III of the majority opinion and would reverse the judgment of the court of appeals and return the case to that court with directions to remand for a new trial.[1]

## I.

The inspection by helicopter at issue here was precipitated by three anonymous telephone calls to police officers, stating in various degrees of detail that the defendant, Bernard Henderson, was engaged in growing and selling marijuana at his residence at 4466 West Bowles Avenue in Littleton, Colorado.[2] The first call came in July 1989 and the latter two were received by the police on September 7 and 8 of that year.

On four consecutive days beginning July 24, 1989, police officers conducted surveillance of 4466 West Bowles Avenue for periods ranging from one-half hour to two hours each day. They learned that 4466 West Bowles Avenue was situated on the southwest corner of an intersection. A six foot wooden fence extended along the east side of the property. From the public sidewalks and the street, the officers could see inside the house and could identify a garage, a shed, and some stables behind the house. During the surveillance the officers saw nothing suggesting that criminal activity was taking place.

As detailed in the majority opinion, the police officers obtained the cooperation of television station KUSA, Channel 9, in transporting two officers to inspect the property by use of a KUSA helicopter. See maj. op. at 385–386. On September 8, 1989, the helicopter made four to five passes over the property, including one directly over the residence, at altitudes ranging between 500 and 700 feet. Once, the helicopter hovered in place directly over the property. These activities occupied approximately five minutes, during which the officers took still photographs of the property and a KUSA news photographer recorded observations with a videocamera. Based in part on the information obtained from the inspection, the officers obtained a search warrant, conducted a search of the premises, and acquired the incriminating evidence of marijuana cultivation that became the subject of the defendant's motion to suppress evidence.

Officer Greg Bohlen, who received the first and last of the three calls from the anonymous informant, was one of the two officers on the flight. He executed the affidavit for search warrant and was the only participant in the helicopter flight who testified at the suppression hearing. In the affidavit, he stated that during the flight he observed a shed with a "clear plastic type roof" consis-

---

1. Although I do not find it necessary to reach the newsperson privilege issue discussed in part IV of the majority opinion, I agree with that discussion.

2. The trial court's findings are brief. I derive the facts, as the majority necessarily does, from essentially undisputed evidence in the record.

tent with the cultivation of marijuana. He stated that he "observed through the clear plastic a green leafy plant which is consistent with Marihuana" and that he believed the plants to be marijuana based on the information from the anonymous calls and on his own observations. At the hearing, Bohlen acknowledged that the plastic was not "clear like a window" but maintained that neither was it like a shower curtain, because "[s]hower curtains are really hard to see through. I could see through this." He also testified that his eyesight was better than 20–20 and that by naked eye he could obtain a clearer vision of the premises than what was depicted on the photographs. The defendant, on the other hand, testified that the covering on the shed consisted of four layers of plastic reinforced by chicken wire. The trial court noted that the covering was made up of "some layers of plastic" but resolved the credibility issue by finding that Bohlen "did have the ability, based on his expertise, to see plants of such a significant size from the area of 500 feet of air space above it."

In ruling on the defendant's motion to suppress evidence, the trial court held that the defendant had an expectation of privacy in his house and curtilage,[3] but held that a helicopter operating as did the one in this case does not "violate[ ] a reasonable expectation of privacy that a normal citizen would have." Relying principally on *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), the Colorado Court of Appeals affirmed. *People v. Henderson,* 847 P.2d 239, 241–43 (Colo.App.1993).

## II.

### A.

The right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures is guaranteed by both the United States Constitution and the Colorado Constitution. U.S. Const. amend. IV; Colo. Const. art. II, § 7; *Hoffman v. People,* 780 P.2d 471, 473 (Colo.

1989). In order to safeguard this right, a warrant is generally required before a government official may conduct a search. *See United States v. Karo,* 468 U.S. 705, 714–15, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984). In particular, warrantless searches are presumptively invalid as contravening the federal and state constitutional protections against unreasonable searches, subject only to a few specifically delineated exceptions. *Hoffman,* 780 P.2d at 474.

The issue presented in the present case is whether the inspection of the defendant's residence property and curtilage constituted a search. It is undisputed that no warrant was obtained to support the aerial inspection and that none of the small group of exceptions to the warrant requirement is applicable. The determination of whether governmental activities constitute a search requires delineation of the interests protected by the Fourth Amendment. In *Hoffman,* we summarized the well-settled principles by which those interests are to be identified:

> The touchstone of fourth amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy" in the area or item searched or seized. *Katz v. U.S.,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). *See Ciraolo,* 476 U.S. at 211, 106 S.Ct. at 1811; *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984). That determination requires the court to ascertain whether an individual has exhibited a subjective expectation of privacy in the particular place or object in question and whether that subjective expectation is one society recognizes as reasonable. *Katz,* 389 U.S. at 361, 88 S.Ct. at 516. The existence of a legitimate expectation of privacy must be determined after examining all the facts and circumstances in each particular case. *Oliver,* 466 U.S. at 177–78, 104 S.Ct. at 1740–41; *People v. Shorty,* 731 P.2d 679, 681 (Colo.1987); *People v. Oates,* 698 P.2d 811, 819 (Colo.1985); *People v. Savage,* 630 P.2d 1070, 1073 (Colo.1981).

---

**3.** "Curtilage is a common-law concept which generally refers to the enclosed space of ground and buildings immediately surrounding a dwellinghouse." *Hoffman v. People,* 780 P.2d 471,

472 n. 3 (Colo.1989). It is undisputed that the shed in which the marijuana was growing was within the curtilage.

*Hoffman,* 780 P.2d at 474. A determination of whether a person has a constitutionally protected reasonable expectation of privacy in an area or item to be searched, therefore, requires a two-part analysis. First, the court must ascertain whether the defendant manifested a subjective expectation of privacy in the area or item to be searched. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986); *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967); *Hoffman,* 780 P.2d at 474. Once it has been demonstrated that the defendant did manifest such an expectation, the next step is to determine whether that expectation was objectively reasonable—that is, one that society recognizes as reasonable. *Ciraolo,* 476 U.S. at 211, 106 S.Ct. at 1811; *Katz,* 389 U.S. at 361, 88 S.Ct. at 516–17; *Hoffman,* 780 P.2d at 474.

The defendant manifested a subjective expectation of privacy in the interior of the covered shed. The defendant took precautions to protect the contents of the shed from observation. The shed itself was located in the backyard of the defendant's home, within the curtilage. The sides of the shed shielded the interior from ground-level observation, and layers of plastic covered the top. A six foot wooden fence along the east side of the property adjoining the street offered further protection. Under these circumstances there can be no doubt that the defendant intended and expected that the shed would not be open to public inspection. *See Riley,* 488 U.S. at 450, 109 S.Ct. at 697. Thus, the first prong of the analysis has been satisfied.

It is the second prong—whether the expectation of privacy is one society recognizes as reasonable—that is at issue here. A deeply divided United States Supreme Court has delivered two decisions involving aerial surveillance that provide guidance for resolution of this issue. The first is *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809,.90 L.Ed.2d 210 (1986), the second *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989).

In *Ciraolo* the Court, in a five to four decision, held that police officers' aerial observations of plants growing in the curtilage of a home and "readily discernible to the naked eye as marijuana" from an airplane lawfully operating at an altitude of 1,000 feet did not violate "an expectation of privacy that is reasonable." *Id.,* 476 U.S. at 213, 106 S.Ct. at 1812. High fences six and ten feet tall surrounded the property and prevented observation of the eight to ten feet high plants from ground level. In reaching its conclusion, the Court found it irrelevant that the purpose of the flight was to identify the plants and that the officers were trained to recognize marijuana. *Id.* at 213, 106 S.Ct. at 1812. The Court acknowledged that Fourth Amendment protections extend to the curtilage, *see supra* note 3, but noted that the observations took place "within public navigable airspace" and "in a physically nonintrusive manner" and that "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed." *Id.* at 213–14, 106 S.Ct. at 1813. The Court summarized:

"In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet." *Id.* at 215, 106 S.Ct. at 1813.

Three years after issuing *Ciraolo,* the Court decided *Riley.* That case involved an aerial observation of a greenhouse by helicopter. The greenhouse was located behind a mobile home on a five acre parcel of rural property. Two sides of the greenhouse were not enclosed, but the contents of the structure were obscured from view by trees, shrubs, and the mobile home. The greenhouse roof was made up of both translucent and opaque panels, but two panels, constituting approximately ten percent of the roof area, were missing. Operating on a tip, and being unable to see the contents of the greenhouse from the road, an investigating officer circled twice over the property in a helicopter at a height of 400 feet and, through the openings in the sides and roof, was able to identify what he thought to be marijuana growing in the structure. A plurality of four justices held that *Ciraolo* controlled and that the inspection was not a

search subject to the Fourth Amendment. "Our reasoning [in *Ciraolo*] was that the home and its curtilage are not necessarily protected from inspection that involves no physical invasion." *Riley*, 488 U.S. at 449, 109 S.Ct. at 696. Noting that what a person knowingly exposes to the public even in his own home or office is not subject to Fourth Amendment protection, that generally police may see what may be seen from a public vantage point where they have a right to be, that private and commercial flight by helicopter in the public airways is routine in this country, and that the helicopter was within navigable airspace specified by law and Federal Aviation Administration (FAA) regulations, the plurality rejected the respondent's claim that he reasonably anticipated that the greenhouse would not be subject to observation from that altitude. *Id.* at 449–52, 109 S.Ct. at 696–97. The plurality cautioned, however, that an inspection of the curtilage of a house from an aircraft will not necessarily always pass muster under the Fourth Amendment simply because the plane was within the lawful navigable air space, *id.* at 451, 109 S.Ct. at 697, and concluded:

> Neither is there any intimation here that the helicopter interfered with respondent's normal use of the greenhouse or of other parts of the curtilage. As far as this record reveals, no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury.

*Id.* at 452, 109 S.Ct. at 697.

Justice O'Connor's opinion concurring in the judgment in *Riley* supplied the vote necessary to make up a majority for the holding that the inspection by helicopter did not violate an expectation of privacy that society is prepared to recognize as reasonable and therefore did not constitute a search. She criticized the plurality approach, however, because it "rests the scope of Fourth Amendment protection too heavily on compliance with FAA regulations whose purpose is to promote air safety, not to protect '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Id.* (O'Connor, J., concurring in the judgment) (quoting

U.S. Const. amend. IV). Justice O'Connor echoed *Ciraolo* in emphasizing the importance of the curtilage in Fourth Amendment doctrine: "'The protection afforded the curtilage is essentially a protection of families and personal property in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" *Id.* (quoting *Ciraolo,* 476 U.S. at 212–13, 106 S.Ct. at 1812). Justice O'Connor noted, however, that police officers are not required to shield their eyes when passing by a home on public thoroughfares and that in *Ciraolo* the court had likened the observation from the plane to such observations from public ways. This analogy applied "because public air travel at 1,000 feet is a sufficiently routine part of modern life that it is unreasonable for persons on the ground to expect that their curtilage will not be observed from the air at that altitude." *Id.* 488 U.S. at 453, 109 S.Ct. at 698. Noting the practical difficulties of concealing outdoor patios and yards from all conceivable aerial views, Justice O'Connor stated that "[t]he fact that a helicopter could conceivably observe the curtilage at virtually any altitude or angle, without violating FAA regulations, does not in itself mean that an individual has no reasonable expectation of privacy from such observation." *Id.* at 454, 109 S.Ct. at 699. She then articulated a test for determining whether one has a reasonable expectation of privacy in cases such as this:

> In determining whether Riley had a reasonable expectation of privacy from aerial observation, the relevant inquiry after *Ciraolo* is not whether the helicopter was where it had a right to be under FAA regulations. Rather, consistent with *Katz, we must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that Riley's expectation of privacy from aerial observation was not* "one that society is prepared to recognize as 'reasonable.'" ... Nor is it conclusive that police helicopters may often fly at 400 feet. If the public rarely, if ever, travels overhead at such altitudes, the observation cannot be said to be from a vantage point generally used by the public and Riley

cannot be said to have "knowingly expose[d]" his greenhouse to public view. *Id.* at 454–55, 109 S.Ct. at 699 (emphasis added). The plurality, as well, considered the frequency of low-level overflights to be of some significance: "[T]here is nothing in the record or before us to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude." *Id.* at 451–52, 109 S.Ct. at 697 (plurality opinion).

The defendant in *Riley* introduced no evidence concerning the frequency of public use of the airspace at the altitude in question. *See Riley,* 488 U.S. at 455, 109 S.Ct. at 699. Justice O'Connor resolved the search issue by holding that the defendant must bear the burden of proving his expectation of privacy was reasonable.[4] She concluded, "[b]ecause there is reason to believe that there is considerable public use of airspace at altitudes of 400 feet and above, and because Riley introduced no evidence to the contrary before the Florida courts, I conclude that Riley's expectation that his curtilage was protected from naked-eye aerial observation from that altitude was not a reasonable one." *Id.*

The general principle that emerges from *Ciraolo* and *Riley* is that a person has no reasonable expectation of privacy with respect to those features of a residence and its curtilage that can be observed from the air with the naked eye at altitudes flown by members of the public with some regularity. As is apparent from the Court's analyses in those cases, however, the facts and circumstances of each individual case must also be examined as they bear on the reasonableness of the expectation of privacy. *See also Oliver v. United States,* 466 U.S. 170, 177–78, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984); *Hoffman,* 780 P.2d at 474.

### B.

The majority purports to apply a totality of the circumstances test to determine whether Henderson had a reasonable expectation of privacy. However, the majority relies on only two factors in arriving at its conclusion that the aerial inspection of the defendant's property was not a search. First, because the helicopter "was flying at an altitude of between 500 and 700 feet, which is a permissible altitude under current FAA regulations," the marijuana, in the majority's opinion, "was in plain view to anyone legally viewing the shed from the helicopter." Maj. op. at 389, 390. Second, the observation "posed only a very limited degree of intrusiveness" because of the duration and altitude of the flight and the limited evidence of "noise, wind, dust, threat of injury, or interference with the use of the curtilage." *Id.* at 390.

It is true that the helicopter was flying at altitudes permitted by FAA regulations and in that sense the observations were made while the helicopter and its occupants were at a lawful location. This, however, is not dispositive, as both the plurality and Justice O'Connor agreed in *Riley. See Riley,* 488 U.S. at 451, 109 S.Ct. at 697 ("This is not to say that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable

---

**4.** The burden of proof issue has not been definitively resolved. The plurality in *Riley* does not address it directly, although the absence of evidence concerning the rarity of helicopter flights at 400 feet was a factor employed to the disadvantage of the party asserting that the aerial inspection was a search. *See Riley,* 488 U.S. at 451–52, 109 S.Ct. at 697. Justice Brennan, in a dissenting opinion joined by two other justices, would have resolved the issue of the frequency of low level helicopter flights by taking judicial notice that flights by privately owned helicopters at an altitude of 400 feet over populated areas "are a rarity and are almost entirely limited to approaching or leaving airports or to reporting traffic congestion near major roadways." *Id.* at

465, 109 S.Ct. at 704 (Brennan, J., dissenting). Justice Blackmun in dissent would have resolved the burden of proof based on a judicial estimate of probabilities and, believing that private helicopters rarely fly over curtilages at an altitude of 400 feet, would have imposed upon the prosecution the burden of proving the contrary as to any flight lower than the 1,000 foot elevation at issue in *Ciraolo. Id.* at 467–468, 109 S.Ct. at 705–06 (Blackmun, J., dissenting). I disagree with the majority, therefore, that *Riley* resolves the burden of proof issue. *See* maj. op. at 389 n. 7. I do not regard the question as of particular importance in resolving the present case, however, because the defendant here testified to the absence of helicopter flights in the area.

airspace specified by law." (plurality opinion)); *id.* at 453, 109 S.Ct. at 698 ("Although 'helicopters are not bound by the lower limits of the navigable airspace allowed to other aircraft,' *ante,* at 451, [109 S.Ct. at 697] there is no reason to assume that compliance with FAA regulations alone determines ' "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." ' " (O'Connor, J., concurring in judgment) (quoting *Ciraolo,* 476 U.S. at 212, 106 S.Ct. at 1812 (in turn quoting *Oliver,* 466 U.S. at 182–83, 104 S.Ct. at 1743)). After all, the purpose of FAA regulations is to promote safety, not to protect " '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures.' " *Riley,* 488 U.S. at 452, 109 S.Ct. at 697 (O'Connor, J. concurring in the judgment) (quoting U.S. Const. amend. IV).

Furthermore, the contents of the covered shed simply cannot be fairly described as having been in plain view. Unlike *Ciraolo,* this is not a case where "[a]ny member of the public flying in this airspace who glanced down would have seen everything that these officers observed." *Ciraolo,* 476 U.S. at 213–14, 106 S.Ct. at 1812–13. The helicopter here made four to five passes, hovered over the property, and took five minutes to enable Officer Bohlen to determine that plants were growing underneath the layers of plastic in the covered shed. As well as can be determined from the record, the roof was sufficiently translucent to permit only a determination upon close examination from the air that some type of large, green plants were being grown. It is implicit in Officer Bohlen's testimony and the findings of the trial court that absent the information provided by the anonymous tips, Officer Bohlen would not have been able to arrive at an *opinion* that the growing plants were marijuana. The plants were *not growing in the open* as in *Ciraolo,* nor was there an unobstructed view of them through the open sides or roof of a structure as in *Riley.* Rather, they were covered by a roof made up of layers of plastic and were protected from view from public ways on the ground. As Justice O'Connor noted in her opinion concurring in the judgment in *Riley,* "[t]o require individuals to completely cover and enclose their curtilage is to demand more than the 'precautions customarily taken by those seeking privacy.' " *Riley,* 488 U.S. at 454, 109 S.Ct. at 699 (O'Connor, J., concurring in judgment) (quoting *Rakas v. Illinois,* 439 U.S. 128, 152, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (1978) (Powell, J., concurring)). I discover no basis for a conclusion that the use of the translucent roofing material exposed the plants to public view.

The second of the two factors considered by the majority is intrusiveness. The majority concludes that "the observation posed only a very limited degree of intrusiveness" because "[t]here is little evidence of the noise, wind, dust, threat of injury, or interference with the use of the curtilage" and the neighbors did not come out of their homes to see the helicopter. Maj. op. at 390. This analysis neglects an aspect of intrusiveness central to Fourth Amendment values. Here, the occupants of the helicopter, by making four or five passes and hovering over the property, were positioned to examine the entire curtilage and to observe any activities taking place there. Such an examination of an area that has been recognized as "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened," *Ciraolo,* 476 U.S. at 213, 106 S.Ct. at 1812, posed a degree of intrusiveness far greater than the "very limited degree of intrusiveness" acknowledged by the majority. *See* maj. op. at 390.

When isolating and analyzing the relevant facts and circumstances, it is important not to lose sight of the larger picture. Here, police spent approximately five minutes over a residence and curtilage scrutinizing the area and taking photos in order to attempt to determine the contents of a shed covered with translucent material. This was not the type of information that a member of the public could readily ascertain while passing over the property in an airplane or helicopter. In fact, the location was one that, according to the unrebutted testimony of the defendant, was not within the path of any ongoing commercial or other air traffic and had not been overflown by helicopter or air-

plane.[5] All these things are relevant when considering the totality of the circumstances. I do not believe that either *Riley* or *Ciraolo* can be read to hold that aerial surveillance, without regard to its duration or nature, will never constitute a search as long as FAA regulations are not transgressed, *see supra* at 397–398, a principle that the majority opinion comes dangerously close to adopting. *See* maj. op. at 389–390.

Certainly, the activities of the defendant were reprehensible and can evoke no judicial sympathy. But we cannot permit this to divert our attention from the fact that the principles established in cases such as this delineate the extent to which official intrusion into the privacy of any citizen will be constitutionally permissible. In my opinion, the police conduct in this case violated the defendant's reasonable expectation of privacy and constituted a forbidden warrantless search under both the United States Constitution and the Colorado Constitution.[6]

## III.

Having determined that the evidence obtained by aerial surveillance was the result of a warrantless search, it cannot be used to support the issuance of a search warrant. *See Bartley v. People,* 817 P.2d 1029, 1033 (Colo.1991) (information obtained by uncon-

stitutional means cannot be relied upon to support a search warrant). The issue therefore becomes "whether the legally obtained information in the affidavit is sufficient, independent of that secured by unconstitutional means, to establish probable cause." *Id.;* accord *People v. McFall,* 672 P.2d 534, 539 (Colo.1983) (search warrant not tainted where affidavit provided sufficient reliable information independent of information illegally obtained). Absent the information unconstitutionally obtained from the aerial overview, the affidavit here contained only the allegations of an anonymous informant.

Whether an affidavit based on information provided by an anonymous informant is sufficient to establish probable cause must be evaluated on the basis of the totality of the circumstances test formulated by the United States Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See People v. Paquin,* 811 P.2d 394, 397 (Colo.1991) (confidential informant); *People v. Pannebaker,* 714 P.2d 904, 907 (Colo. 1986) (same). The judge issuing the search warrant must make

a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a

---

5. Although Officer Bohlen testified that it was not unusual to fly over a residential area at 500 to 700 feet, he was not speaking of any particular location and it is not clear whether he was referring to police helicopters or helicopters transporting members of the public. *See Riley,* 488 U.S. at 454–55, 109 S.Ct. at 698–99 (O'Connor, J., concurring in judgment) (emphasizing that it is public traffic, not police flights, that determine the frequency of overflights for the purpose of resolving the issue of reasonableness of the expectation of privacy).

6. In a number of circumstances, we have held that the Colorado Constitution provides more extensive protection than does the United States Constitution. *See, e.g., People v. Oates,* 698 P.2d 811, 815–16 (Colo.1985) (departing from the reasoning in *United States v. Karo,* 468 U.S. 705, 714–15, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984), the court held that an expectation that purchased commercial goods will be free of government surveillance devices such as beepers was a legitimate expectation of privacy); *People v. Corr,* 682 P.2d 20, 27–28 (Colo.1984), *cert. denied,* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d

115 (1984) (an expectation of privacy in telephone toll records is reasonable under the Colorado constitution despite the holding in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), that there is no such legitimate expectation of privacy under the Fourth Amendment); *People v. Sporleder,* 666 P.2d 135, 140–42 (Colo.1983) (defendant's expectation of privacy in the numbers dialed on his home telephone is reasonable under Article II, Section 7, of the Colorado Constitution despite the *Smith v. Maryland* decision); *Charnes v. DiGiacomo,* 200 Colo. 94, 100, 612 P.2d 1117, 1120–21 (1980) (taxpayer-defendant had a reasonable expectation of privacy in the bank records of his financial transactions although *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), held that no such expectation exists under the Fourth Amendment).

In view of my conclusion that the aerial inspection at issue here constituted a search under the Fourth Amendment, it is unnecessary to consider whether the standards for aerial searches are more protective under the Colorado Constitution.

fair probability that contraband or evidence of a crime will be found in a particular place."

*Paquin,* 811 P.2d at 397–98 (quoting *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332).

Because the informant was anonymous, it is difficult if not impossible in this case to assess his veracity. There is no indication that the informant has ever provided reliable information on past occasions, and the information supplied included no admission of criminal conduct or other indication of reliability. *See People v. Turcotte–Schaeffer,* 843 P.2d 658, 661 (Colo.1993) (admissions against penal interest have traditionally been relied upon as a means of showing that information is reliable); *Paquin,* 811 P.2d at 398 (emphasizing that the affidavit for search warrant contained a statement that the informant had purchased narcotics from the defendant and, further, that the informant had previously provided information that resulted in a felony arrest).

Although a "deficiency regarding reliability and veracity can be overcome by a *strong showing* as to the informant's basis of knowledge or some other indicia of reliability," *People v. Leftwich,* 869 P.2d 1260, 1266 (Colo. 1994) (emphasis in original), the affidavit did not contain such a showing. The informant offered several detailed allegations regarding the defendant's distribution operation. He advised Officer Bohlen that he had observed sacks of marijuana, scales, weapons, and $5,000 in cash at the defendant's property. He also stated that he had seen the defendant enter a shed to the southwest of the house and exit with a five foot marijuana plant. According to the informant, the defendant bagged the plant and sold it to a second person. "[T]he giving of a detailed story *by itself* does not establish reliability because an informant could simply tell an elaborate lie." *Turcotte–Schaeffer,* 843 P.2d at 662 (emphasis added). Some other indicia of reliability are necessary.

The *Gates* totality of the circumstances test "places particular importance on the value of corroboration of the details of an informant's tip by independent police work." *Pannebaker,* 714 P.2d at 907. The only information that the informant provided Officer Bohlen that could be corroborated was a general description of the defendant's property and car, the defendant's name, and his address—facts easily obtained by someone unfamiliar with the defendant. Although it is not necessary that the details corroborated be incriminating in order to support a showing of probable cause, "[f]acts that are easily obtained or predictions that are easily made add little to the decision of whether probable cause for a search exists." *Leftwich,* 869 P.2d at 1268.

Those Colorado cases decided after the reasoning in *Gates* was adopted and in which a confidential informant's statements have been found to establish probable cause are distinguishable. In all those cases, at least some indicia of reliability exist. In some, the informant, though confidential, had proven reliable in the past. *See People v. Higbee,* 802 P.2d 1085 (Colo.1990); *People v. Arellano,* 791 P.2d 1135 (Colo.1990); *People v. Varrieur,* 771 P.2d 895 (Colo.1989). In others, officers were able to corroborate more than simply a location and the name of the defendant. *See Pannebaker,* 714 P.2d at 907 (police observation of suspicious black plastic over defendant's windows was strong corroboration); *People v. Abeyta,* 795 P.2d 1324 (Colo.1990) (heavy traffic flow and seizure of marijuana cigarettes from two people leaving the residence corroborated informants' allegations); *People v. Quintana,* 785 P.2d 934 (Colo.1990) (electric usage records corroborated informant's report of defendant's use of high-energy lights to grow marijuana); *People v. Rowerdink,* 756 P.2d 986 (Colo.1988) (corroboration by interview of another implicated in the criminal activity). And finally, in others, the statements made were against the penal interests of identified informants. *See Turcotte–Schaeffer,* 843 P.2d 658; *People v. Grady,* 755 P.2d 1211 (Colo.1988); *People v. Lubben,* 739 P.2d 833 (Colo.1987).

In the present case, absent the unconstitutionally obtained corroborating evidence obtained by the helicopter overview, the affidavit did not provide the issuing judge a substantial basis for concluding that there was probable cause to believe that drugs would be found on the defendant's property. The warrant was therefore invalid and any evi-

dence obtained pursuant thereto must be suppressed. The fruit of the poisonous tree doctrine excludes evidence uncovered as a result of a Fourth Amendment violation. *People v. McCall,* 672 P.2d 534, 537 (Colo. 1983).

### IV.

For the foregoing reasons, I would reverse the judgment of the court of appeals and return the case to that court with directions to remand to the trial court for a new trial at which the illegally obtained evidence would be excluded. Accordingly, I respectfully dissent.

KIRSHBAUM, J., joins in this dissent.